FIFTH DIVISION

No. 1-06-3744

| | | |
|---|---|---|
| TRAVEL 100 GROUP, INC., on Behalf of Itself and All Others Similarly Situated, | ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDITERRANEAN SHIPPING COMPANY (USA) INC., d/b/a MSC Cruises, a Corporation Organized Under the Laws of the State of New York, | ) ) ) | Honorable James F. Henry and Patrick McGann, |
| | ) | Judges Presiding. |
| Defendant-Appellee | ) | |
| | ) | |
| | ) | |
| (Mediterranean Shipping Company (USA) Inc., | ) | |
| | ) | |
| Third-Party Plaintiff; | ) | |
| | ) | |
| Captaris, Inc., | ) | |
| | ) | |
| Third-Party Defendant). | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiff Travel 100 Group, Inc., appeals the circuit court's entry of summary judgment for defendant Mediterranean Shipping Company (USA), Inc., (MSC) on Travel 100's complaint seeking damages under the Telephone Consumer Protection Act of 1991 (the TCPA) (47 U.S.C. §227 (2000)) for advertisements sent to Travel 100 by facsimile. For the reasons that follow, we affirm.

BACKGROUND

This appeal involves the widespread practice of sending advertisements to the fax machines of businesses and consumers, who often view these documents as the more modern equivalent to "junk mail." This method of distribution became prevalent in the last 15 years as a less expensive alternative to regular mail, especially because the cost of printing the advertisement necessarily is borne by the recipient.

At the time of this litigation, Travel 100 Group operated travel agencies in Chicago and Kenilworth, Illinois. On July 29, 2003, Travel 100 brought a class action lawsuit against MSC, alleging that MSC sent or was responsible for sending an unsolicited advertisement by fax on or around June 24, 2003, to Travel 100 and other members of the class as "part of a mass broadcast of unauthorized faxes." Travel 100 asserted that by sending such advertisements by fax, the documents were printed by using the paper and toner of Travel 100 and other class members, converting those resources for MSC's benefit and shifting to the recipients the cost of printing the messages. Furthermore, Travel 100 stated it could not use its fax line while receiving the ad.

Attached to the complaint was a copy of the faxed advertisement describing "2003-2004 Winter Cruises: 7 Nights [*sic*] South America Cruises from $640 per person." The single-page advertisement lists dates, destinations and prices for various trips, broken down by deck and type of cabin. The bottom of the page states "MSC Italian Cruises" with a telephone number, fax number and Web site address. At the top of the page is a line stating: "If you no longer wish to receive faxes, please call (800) 769-6921."

In response to Travel 100's complaint, defendant MSC filed a third-party complaint

against, among others, Captaris, Inc., the company that marketed MSC cruises through its MediaLinq Services division, which provides high volume fax broadcast services. MSC stated that Captaris obtained the list of fax recipients from Northstar Travel Media (Northstar), which owned the Travel-Edge Database.

MSC and the third-party defendants moved for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2004)). The defendants argued that Travel 100 had been a member of the International Airlines Travel Agent Network (IATAN) since 1995 and routinely had supplied its contact information to IATAN and other entities to enable airlines, hotels, cruise lines such as MSC, and other travel suppliers to direct information to Travel 100 about availability and promotions.

The defendants contended that Travel 100 provided IATAN with its contact information, including its fax number, and agreed to the inclusion of that information in IATAN's membership database. IATAN then licensed its database for use by NFO Plog Research, Inc. (Plog), the company that compiled the Travel-Edge Database. Plog and its assets, including the Travel-Edge Database, subsequently were purchased by Northstar.

In response to Travel 100's assertion that it received 93 faxes between January 3, 2001, and July 22, 2003, MSC raised the affirmative defenses of *laches* and estoppel. MSC pointed out that Travel 100 never contacted the toll-free phone number listed on the faxes from MSC to request that it not be faxed advertisements about MSC cruises. MSC further asserted that Travel 100 did not inform IATAN until May 2005 that it did not want to receive promotional faxes and that Travel 100's request only included the fax number of the Kenilworth office. As affirmative

3

defenses, MSC claimed that Travel 100's damages were inconsequential because its actual cost of receiving each fax was approximately 20 cents, and MSC challenged the constitutionality of the TCPA as violative of due process.

On September 29, 2006, the circuit court granted summary judgment in favor of MSC and the third-party defendants, and Travel 100 now appeals. The other third-party defendants are not parties to this appeal.

ANALYSIS

Travel 100 argues that the circuit court erred in granting summary judgment because the record raises a genuine issue of material fact as to whether Travel 100 agreed to receive advertisements from MSC and other travel carriers by fax.

The TCPA prohibits the sending of an unsolicited advertisement to a telephone facsimile machine. 47 U.S.C. §227(b)(1)(C) (2000). An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. §227(a)(4) (2000). The TCPA provides for monetary damage for each violation in the amount of the party's actual monetary loss or $500, whichever is greater. 47 U.S.C. §227(b)(3)(B) (2000). Upon a finding by the court that the defendant willfully or knowingly violated the Act, the court may award treble damages. 47 U.S.C. §227(b)(3) (2000).[1]

---

[1] In 2005, the TCPA was amended and renamed the Junk Fax Prevention Act of 2005 (47 U.S.C. §227 (Supp. 2005).

Travel 100 does not contest its membership in IATAN or dispute that it provided contact information, including its fax number, for inclusion in IATAN's database. Travel 100 maintains that although it "occasionally verified its contact information as requested by IATAN," the documents did not grant Travel 100's express permission to receive advertisements from third parties such as MSC or to receive those ads by fax.

## I. Affidavit of Stacy Fisher

Before reviewing the circuit court's grant of summary judgment, we first consider the affidavit of Travel 100 office manager Stacy Fisher describing a questionnaire that Fisher completed and returned to Plog/Northstar in December 2002. Travel 100 moved to strike Fisher's affidavit, contending it was obtained in violation of Illinois Supreme Court Rule 206 (188 Ill. 2d R. 206). The circuit court stated that its grant of summary judgment for defendants did not rely on Fisher's testimony. However, the circuit court discussed Travel 100's motion to strike the affidavit and addressed the manner in which the affidavit was procured, concluding that counsel for defendants did not violate the discovery rules.

Evidence that would be inadmissible at trial may not be considered in support of or in opposition to a motion for summary judgment. See *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 648, 784 N.E.2d 258, 271 (2002). Therefore, it is necessary to review the circuit court's denial of the motion to strike Fisher's affidavit to determine if the affidavit can be considered in our analysis of MSC's motion for summary judgment.

The parties first disagree on the standard of review to be applied to the denial of the

5

motion to strike the affidavit. Travel 100 seeks *de novo* review of the circuit court's ruling; MSC asserts that because Travel 100 moved to strike the affidavit as a sanction for an alleged discovery violation, the decision should be reviewed for an abuse of discretion. We agree with Travel 100 that *de novo* review is warranted because the circuit court's ruling on the motion to strike was made in connection with the court's ruling on a motion for summary judgment. See *Jackson v. Graham*, 323 Ill. App. 3d 766, 773, 753 N.E.2d 525, 532-32 (2001).

In the affidavit, Fisher stated that from about April 2002 to June 2004, she was an office manager of Travel 100's Chicago office. The office received a questionnaire from Plog/Northstar by fax. Fisher completed the document and returned it by fax on December 16, 2002. The cover letter to the questionnaire stated, in part:

"Dear Travel Agency Owner or Manager:

We are in the process of updating your Company's Profile in our TravelEdge research database, and would appreciate your taking a few minutes to fill out the update form. Having current information enhances the quality of all our research/trend data on the travel agency market, and assures that suppliers will direct relevant promotions and FAM [familiarization] trip information to our participants."

In moving for summary judgment, MSC and the third-party defendants argued that the December 2002 questionnaire, as well as other documents sent from Travel 100 to IATAN, established Travel 100's express invitation and permission to receive advertisements by fax.

Travel 100 moved to strike Fisher's affidavit, contending that it was not given notice of

the January 17, 2006, deposition of Fisher by counsel for Captaris. Travel 100 argues that the attorneys for Captaris led Fisher to believe she was being subpoenaed for a deposition at which she had no choice but to appear. Travel 100 asserted that what was represented to be a deposition actually amounted to an "*ex parte* witness interview" and that the affidavit should be stricken to punish the attorneys' conduct. On appeal, Travel 100 renews that argument, asserting that the circuit court should not have allowed use of the affidavit because Travel 100 was not notified of Fisher's deposition and Captaris "improperly procured" the affidavit as a result.

Although the discovery rules are in place to govern the flow of information once a lawsuit has been filed, the rules "do not bar all *ex parte* investigations" after the filing of a complaint. *Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.*, 128 Ill. App. 3d 763, 770, 471 N.E.2d 554, 560 (1984). Fisher was terminated from her position at Travel 100 because the agency suspected her of engaging in unethical conduct. Although Travel 100 asserts that Fisher's affidavit should be discounted due to her bias against the agency, Travel 100 was aware of Fisher's role in the pertinent facts, and counsel for Travel 100 deposed Fisher before it responded to the motion for summary judgment; Travel 100 therefore had the opportunity to explore and expose the motives for Fisher's testimony. We find no basis to reverse the circuit court's denial of the motion to strike Fisher's affidavit.

## II. Summary Judgment for MSC

The proceeding in the circuit court involved several defendants; however, MSC is the only defendant-appellee in this appeal. Summary judgment is proper where the pleadings,

7

depositions, admissions and affidavits on file, viewed in the light most favorable to the non-moving party, reveal no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *State Farm Mutual Automobile Insurance Co. v. Illinois Farmers Insurance Co.*, 226 Ill. 2d 395, 400, 875 N.E.2d 1096, 1099 (2007). In reviewing the circuit court's ruling on a motion for summary judgment, the appellate court considers anew the facts and law related to the case and determines whether the circuit court was correct in its decision. *Follis v. Watkins*, 367 Ill. App. 3d 548, 556, 855 N.E.2d 579, 586 (2006). Our review of a grant of summary judgment is *de novo*. See *State Farm*, 226 Ill. 2d at 400, 875 N.E.2d at 1099.

The purpose of summary judgment is not to try a question of fact but, rather, to determine if a question of fact exists. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280, 864 N.E.2d 227, 232 (2007). "If the undisputed material facts could lead reasonable observers to divergent inferences, or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Forsythe*, 224 Ill. 2d at 280, 864 N.E.2d at 232. Summary judgment should not be entered unless the moving party's right to judgment is clear and free from doubt. *Mydlach v. DaimlerChrysler Corp.*, 226 Ill. 2d 307, 311, 875 N.E.2d 1047, 1053 (2007).

Under the TCPA, an advertisement is unsolicited if it is transmitted without the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(3)(A) (2000). Travel 100 argues that its inclusion in IATAN's database and the presentation of its contact information on various forms did not constitute its "express invitation or permission" for the transmission of advertisements. However, our analysis of the communications between Travel 100 and IATAN

reveals that Travel 100 approved the inclusion of its contact information in the IATAN database, and Travel 100 representatives signed and returned documents that expressly stated the information would be provided to travel-industry suppliers, thus inviting communications from those businesses.

To begin with, Travel 100 (then doing business as Ivory Isle Travel) received a letter from IATAN in May 2001, which stated, in relevant part:

"Dear Owner/Manager:

We need your help!  As an IATAN endorsed agency, you enjoy the benefit of holding an IATA Numeric Code that identifies you to the travel supplier community.  *This code number also enables suppliers to pay commissions and to market their products and services to you directly.*  In order for this to happen most efficiently and cost-effectively, we must rely on the accuracy of our database, which contains up-to-date profile information about travel agencies in the U.S. and its possessions.

IATAN's database is unique and plays an essential role within the industry to identify legitimate travel sales outlets.  That is why we are currently in the process of updating our system so that we may better serve you, our valuable customer.

*By completing the attached IATAN Travel Agency Survey, we will be able to offer more specific information about your agency's marketing and destination specialties.*  It will also help us to better identify who you are because it asks you

to indicate your agency's principal activity as well as its primary market focus in either leisure or corporate travel." (Emphasis added.)

The survey was returned to IATAN by Ivory Isle Travel with the responses correlating to the agency's clientele. The bottom of the page was labeled an "information disclosure authorization" and listed the address, phone number, fax number, e-mail address and Web address of Ivory Isle Travel and a place for corrections to be made to that information. The authorization was signed by Howard Scharf, then the vice president of Travel 100.[2]

The record reflects that between August 2002 and May 2003, IATAN requested on at least three occasions that Travel 100 verify its contact information for use by "industry customers" or "industry participants." A representative of Travel 100 complied with each request by a form or release and returning it to IATAN, often by fax. According to the discovery deposition of Travel 100 office manager Rosemarie McGuire, McGuire completed and returned a form to IATAN in August 2002 because Travel 100 wanted IATAN to inform suppliers of Travel 100's contact information, including its IATAN number. A similar communication in April 2003 stated that the contact information was for inclusion into the IATAN database and that the database's purpose was to "aid in the administration of IATAN programs to provide contact information to other industry participants." A form that Travel 100 received in May 2003 stated that "[t]he applicant authorizes [IATAN] to release the information contained herein to any

---

[2] Scharf described membership in IATAN as a "seal of approval" for travel agencies; Travel 100 states in its brief on appeal that an IATAN number is an important identifier for a travel agent and that the number is used by airlines and hotels to make reservations for the agency's clients.

industry supplier that may wish to use the applicant's services."  In addition, as we have previously discussed, Fisher completed and returned a questionnaire to Plog/Northstar in December 2002 "to ensure that our office would receive targeted marketing/promotional materials from travel suppliers, including by fax."[3]

On appeal, Travel 100 argues that the documents it executed did not establish its express consent under the TCPA.  No Illinois case has addressed the "express invitation or permission" language of the statute.  The Illinois Supreme Court's only opinion involving the TCPA did not discuss the topic of consent.  See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 860 N.E.2d 307 (2006) (addressing insurer's duty to defend lawsuit against insured brought under TCPA).   The United States District Court for the Northern District of Illinois recently denied a defendant's motion to dismiss a TCPA claim.  In *Sadowski v. Med1 Online,*

---

[3] After Travel 100 filed suit in July 2003, the course of its conduct regarding IATAN changed.  In April 2004, Travel 100 received an IATAN application that Scharf returned with Travel 100's fax number crossed out.

We also note that despite Travel 100's stated objection to the faxes, Scharf and McGuire signed a more specific IATAN release in 2004, which stated, in part:

"**Consent**

As owner/manager of the location I understand and agreed [*sic*] that one benefit of IATAN endorsement is the periodic receipt of travel-related information.  The undersigned hereby certifies and acknowledges that we consent to receive travel information and travel-related facsimile communications, electronic mail communications and direct mail communications, including material advertising the commercial availability or quality of property, goods, or services from IATAN [] authorized licensees and their duly authorized customers at the fax number(s) and e-mail addresses contained in this recertification.  In order to receive this benefit of IATAN endorsement, we consent to IATAN providing the fax number(s) and e-mail address(es) contained herein for this purpose.  By signing this written consent, I represent that I am authorized to grant consent to receive faxes, e-mails and other communications."

Lawrence Weiner, a director of Travel 100, executed the same release in November 2004.

*LLC*, No. 07 C 2973 (N.D. Ill. February 20, 2008), the federal district court observed that it was required to accept as true the allegation of the plaintiff doctor that he had no prior business relationship with the defendant; the court referred to an exception inserted in the TCPA in 2005 that classifies faxes between parties with an "established business relationship" as transactional and outside the statute's scope. See 47 U.S.C. § 227 (b)(1)(C)(i) (Supp. 2005).

Many published decisions regarding the TCPA have involved challenges under the first amendment and the commerce clause of the United States Constitution and have included due process and equal protection arguments. See, *e.g.*, *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 323 F.3d 649 (8th Cir. 2003), *cert. denied*, 540 U.S. 1104, 157 L. Ed. 2d 888, 124 S. Ct. 1043 (2004) (restrictions on unsolicited fax communications do not violate first amendment); *Chair King, Inc., v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365 (Tex. App. 2004).

Given this lack of direct precedent, Travel 100 compares its situation to that of the plaintiff in *Travel Travel, Kirkwood, Inc. v. Jen N.Y. Inc.*, 206 S.W.3d 387, 390 (Mo. App. 2006). In that case, the plaintiff travel agency sued an airline ticket consolidator under the TCPA for sending 31 unsolicited advertisements by fax. The Missouri appellate court affirmed the trial court's grant of summary judgment for the travel agency and an award of $46,500 plus court costs. *Travel Kirkwood*, 206 S.W.3d at 388. The agency executed a form identical to the IATAN membership form in this case, which stated in pertinent part: "The applicant authorizes [IATAN] to release the information contained herein to any industry supplier that may wish to use the applicant's services." *Travel Kirkwood*, 206 S.W.3d at 391.

On appeal, the defendant argued that the agency agreed to receive faxed advertisements

12

by its affiliation with IATAN and its completion of the membership form. *Travel Kirkwood*, 206 S.W.3d at 390. The Missouri appellate court concluded that whether the agency's IATAN membership constituted "prior express invitation or permission" under the TCPA was, as the trial court had determined, a question of law and that the agency had not given its express consent to receive faxes. *Travel Kirkwood*, 206 S.W.3d at 391-92. The court noted the conclusion of the Federal Communications Commission (FCC) that the TCPA was not designed "to equate mere distribution or publication of a telephone facsimile number with prior express permission or invitation to receive such advertisements." *Travel Kirkwood*, 206 S.W.3d at 392, quoting *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 F.C.C.R. 12,391, 12,408 (August 7, 1995) (reconsideration order). The court held that the FCC's interpretation of the statute and the plain meaning of the word "express" supported the conclusion that the agency did not convey its prior express invitation or permission to send faxes merely by its membership in IATAN. *Travel Kirkwood*, 206 S.W.3d at 392.

Though we note the paucity of case law on this issue, we first observe that a decision from another jurisdiction is not binding on this court. See *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 455, 818 N.E.2d 713, 722 (2004). Furthermore, we disagree with the analysis of the Missouri court. The court concluded that the plaintiff travel agency's agreement that IATAN could distribute the agency's fax number to other members of IATAN constituted, at most, implicit consent to receive unsolicited advertisements:

> "The defendant seems to believe that the plaintiff's agreement to release of
> its fax number to IATAN members necessarily implies consent to receive

13

unsolicited advertisements from such members. But even if that were the case, the defendant ignores the fact that implicit consent is insufficient under the law. If the consent is not manifested by explicit and direct words, but rather is gathered only by implication or necessary deduction from the circumstances, the general language, or the conduct of the parties, it is not express consent. Rather, it is merely implied consent. And, without express consent, the law forbids the defendant from sending unsolicited facsimiles to the plaintiff." *Travel Kirkwood*, 206 S.W.3d at 392.

However, the Missouri court fails to acknowledge that the plaintiff travel agency, in addition to agreeing that its contact information be included in the IATAN database, also completed a form, as did Travel 100 here, authorizing IATAN "to release the information contained herein to any industry supplier that may wish to use the applicant's services." By the Missouri court's reasoning, an industry supplier, such as a hotel, airline or cruise line, that belongs to an organization with access to a database of travel agents through a licensing agreement must seek permission from each travel agency before sending advertisements. The largely unworkable nature of that situation was noted by a Missouri federal court in *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 196 F. Supp. 2d 920, 933 n.26 (E.D. Mo. 2002), *rev'd*, 323 F.3d 649 (8th Cir. 2003), while discussing a first amendment challenge to the TCPA:

"The government argues that the TCPA is not a complete ban [on unsolicited advertisements] because it allows fax advertisements to be sent if the consumer gives express permission. However, there is no practical way for

14

companies to gain permission. They could fax a request form to the consumer asking for permission, and forcing the consumer to fax something back to the company, but that does not seem sensible."

The circuit court in this case made a similar salient observation in its memorandum opinion:

"It would be an unreasonable interpretation of the statute to conclude that Travel 100 was entitled to approve the individual supplier's use of its facsimile machine prior to transmission of any message in order to comply with the TCPA. Such conclusion would be at odds with Congress' intent to allow business with unencumbered access to commercial communication links. It would also upset what the evidence suggests was an accepted industry-wide practice."

The undisputed facts establish Travel 100's express permission and invitation for advertisements to be sent by third parties, *i.e.*, travel suppliers such as MSC. It is uncontroverted that Travel 100 went beyond simply agreeing to the inclusion of its contact information in the IATAN database. Various representatives of Travel 100 submitted the agency's contact information upon being told that IATAN would release the information "to any industry supplier that may wish to use" Travel 100's services. The questionnaire that Fisher returned to Plog/Northstar indicated that Travel 100's contact information "assures that suppliers will direct relevant promotions and FAM [familiarization] trip information to our participants." Fisher suggested that the faxed advertisements were advantageous to Travel 100 and stated that she collected the documents and maintained a binder of the advertisements for reference by the travel

15

agents in the office. Fisher also stated that Travel 100 sold trips and other services to customers as a result of the information in the faxed advertisements.

Another nuance of Travel 100's position appears to be that because it did not state its permission or invitation to receive advertisements in its own words, it did not expressly agree to such communications. However, by submitting its information on the releases described above, Travel 100 indicated its express agreement to receive marketing materials from suppliers of travel services.

Travel 100 also contends that it never permitted or invited the sending of advertisements by fax. MSC responds that the TCPA does not require that the recipient specifically permit faxed communications but simply that the recipient invite or permit the "transmission" of an advertisement. The statute prohibits solicitations by telephone or by fax unless transmitted without express invitation or permission. 47 U.S.C. §227 (a)(3)(A) (2000). Travel 100 supplied both its phone and fax numbers to IATAN for use by travel suppliers in directing promotions and sales information to Travel 100.

Travel 100 became a member of IATAN to improve its commercial contacts and success. The wheels of commerce would become bogged down if each business had to obtain the kind of consent Travel 100 requires, and we will not impede the advances of modern technology and commerce. Based on our analysis of the communications described above, and construing the record in the light most favorable to Travel 100, we nevertheless conclude that, as a matter of law, Travel 100 expressly invited and permitted the faxed advertisements.

In a separate section of its brief, Travel 100 asserts that because it did not expressly allow

1-06-3744

MSC to send advertisements, the circuit court's ruling necessarily was based on a determination of implied permission, which Travel 100 contends was in conflict with the language of the statute, the Federal Communications Commission's construction of the statute, and the intent of Congress in enacting the law. Because we have determined, as did the circuit court, that Travel 100 expressly invited and permitted the advertisements, we need not address Travel 100's contentions regarding implied permission.

CONCLUSION

Travel 100 sought membership in IATAN and maintained that membership, providing the organization with its contact information, including its fax number, in several documents, including a form authorizing IATAN to release that information "to any industry supplier that may wish to use [Travel 100's] services." Therefore, Travel 100 expressly invited and permitted MSC, as a provider of cruises, to fax advertisements to Travel 100.

For all of the reasons set out above, we affirm the circuit court's grant of summary judgment to MSC.

Affirmed.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

17

1-06-3744

TRAVEL 100 GROUP, INC., on Behalf of Itself and All Others Similarly Situated,

     Plaintiff-Appellant,

   v.

MEDITERRANEAN SHIPPING COMPANY (USA) INC., d/b/a MSC Cruises, a Corporation Organized Under the Laws of the State of New York,

     Defendant-Appellee

(Mediterranean Shipping Company (USA) Inc.,

     Third-Party Plaintiff;

Captaris, Inc.,

     Third-Party Defendant).

No. 1-06-3744

Appellate Court of Illinois
First District, Fifth Division

May 30, 2008

JUSTICE GALLAGHER delivered the opinion of the court.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

Appeal from the Circuit Court of Cook County.

Honorable James F. Henry and Patrick E. McGann, Judges Presiding.

For APPELLANT, Barnow and Associates, P.C., Chicago, IL (Ben Barnow, Sharon Harris and Erich Schork, of counsel); William J. Harte, Ltd, Chicago, IL (William J. Harte, of counsel); Stein & Bogot Ltd., Chicago, IL (Robert J. Stein III, of counsel); and Margulis Law Group, Chesterfield, MO (Max Margulis, of counsel)

1-06-3744

For APPELLEE, Locke Lord Bissell & Liddell LLP, Chicago, IL (Albert E. Fowerbaugh, Jr., Hugh S. Balsam, Michael G. Salemi, of counsel)