# Illinois Official Reports

## Appellate Court

*CE Design, Ltd. v. Speedway Crane, LLC*, 2015 IL App (1st) 132572

| | |
|---|---|
| Appellate Court Caption | CE DESIGN, LTD., an Illinois Corporation, Individually and as the Representative of a Class of Similarly Situated Persons, Plaintiff-Appellant and Cross-Appellee, v. SPEEDWAY CRANE, LLC, Defendant-Appellee and Cross-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-2572 |
| Filed | June 18, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2008-CH-22317; the Hon. Diane Larsen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Philip A. Bock and James M. Smith, both of Bock & Hatch, LLC, and Brian J. Wanca, of Anderson & Wanca, both of Chicago, for appellant.<br><br>Thomas E. Sarikas, of Merlo Kanofsky Gregg & Machalinski Ltd., of Chicago, for appellee. |
| Panel | JUSTICE COBBS delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, CE Design, Ltd., was an engineering consulting firm that provided engineering, architectural, and surveying services prior to ceasing operations in 2010. Plaintiff purchased an advertising program for the 2005 and 2006 editions of the Blue Book of Building and Construction (Blue Book) and was a Blue Book customer in 2005. Defendant, Speedway Crane, is an Illinois limited liability company in the crane rental business. It rents cranes to companies for lifting structural steel, residential steel, air conditioners, and industrial plant work. Defendant advertised its services in the Blue Book and was a Blue Book customer in 2005. On June 27, 2005, plaintiff received a one-page fax from defendant advertising its crane rental services. Plaintiff claimed that it did not give prior express permission to receive advertisements by fax. On June 20, 2008, plaintiff brought a class action to obtain relief and recover damages against defendant allegedly caused by the sending of the faxed advertisement. Count I of plaintiff's complaint alleged violation of the Telephone Consumer Protection Act of 1991 (TCPA). 47 U.S.C. § 227 (Supp. III 2004).[1] The TCPA prohibits the sending of an unsolicited facsimile advertisement and provides that monetary damages may be recovered for each violation in the amount of a party's actual pecuniary loss or $500, whichever is greater. *Id.* Counts II and III alleged that the fax constituted conversion and that it violated section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2008)).

¶ 2    Defendant moved for summary judgment on count I, asserting that plaintiff had expressly consented to the receipt of faxed advertisements and also that the issue was moot. The trial court rejected defendant's claim of mootness but entered summary judgment in favor of defendant, finding that plaintiff had given prior express permission to receive faxed advertisements when it invited contact from businesses in the commercial construction industry by voluntarily advertising its fax number in the Blue Book. The court also granted defendant's subsequent motion for summary judgment as to counts II and III.

¶ 3    On appeal, plaintiff claims that the court erred by holding that (1) it gave defendant "prior express invitation or permission" to send advertisements by fax when it listed its contact information in the Blue Book and (2) it had an established business relationship (EBR) with defendant. Plaintiff requests reinstatement but otherwise makes no argument in its brief regarding its conversion and Illinois Consumer Fraud and Deceptive Business Practices Act claims. In its cross-appeal, defendant asserts that the court erred when it denied its motion for summary judgment for mootness, which was premised on plaintiff's rejection of defendant's tender offer. For the reasons that follow, we affirm the trial court's grant of summary judgment and dismiss the cross-appeal.

---

[1]The version of the TCPA that was in effect in June 2005 was subsequently overridden by the passage of the Junk Fax Act on July 9, 2005, which amended the facsimile advertising provisions of the TCPA. See Junk Fax Prevention Act of 2005, Pub. L. No. 109-21, 119 Stat. 359 (2005). We review this case under the 2004 version of the TCPA (47 U.S.C. § 227 (Supp. III 2004)) and Federal Communications Commission interpretations of the TCPA that were in effect when the fax at issue was sent, on June 27, 2005.

¶ 4                                    BACKGROUND

¶ 5        The conduct at issue in this appeal involves the dissemination of business contact information in the Blue Book, published by Contractor's Register. The pleadings and deposition testimony establish the following relevant facts.

¶ 6        The Blue Book is a regional commercial construction directory of "qualified" businesses in commercial construction. The purpose of the Blue Book is to bring buyers and sellers together within the commercial construction industry. In addition, it provides an opportunity for those buyers and sellers to communicate via phone, fax, and e-mail, and also provides a service to the users of the Blue Book with regard to finding quality, qualified contractors, subcontractors, suppliers, and manufacturers.

¶ 7        The Blue Book has 560 construction-related classifications. In order for a business to be listed in the Blue Book, it must be "qualified" as a vendor in commercial construction. To determine whether a business is "qualified," the Blue Book conducts a verification process in which its employees contact the business to ensure that it does, in fact, do business in commercial construction in a specific regional area. The Blue Book does not list any businesses that do work for homeowners only, but does include companies that work on large residential construction projects.

¶ 8        Once a company is "qualified," it has the option of being listed in the Blue Book. If the company chooses to be listed, it can either be "free listed" or it can purchase an advertising program and become a Blue Book "customer." A "free listed" company has its contact information listed among the businesses in that category of service and receives free marketing and exposure to potential buyers. If, however, the company chooses to purchase an advertising program from the Blue Book, its name and contact information will be highlighted so that it stands out. For example, the company can be listed on the first page of the category before the free listings, have color advertisements, have its name and contact information bolded, and/or publish a brief description of the company.

¶ 9        A company that elects to be listed in the Blue Book supplies its contact information to be published in the book's print and online versions. The Blue Book does not require that a company provide its fax number; rather, the company chooses the information that it wants to be published. According to the deposition testimony of Douglas Wulkan, the controller of the 2005 Blue Book, "faxing is an integral part of the commercial construction industry." In fact, the Blue Book provides a bid service called the "BB Bid System" which allows Blue Book users to bid on construction projects by submitting bids, often by fax, to one another.

¶ 10       Plaintiff was a Blue Book customer, having purchased an advertising program for its engineering consulting services in the Blue Book from 1998 until 2007. As a customer, plaintiff submitted its contact information, including its telephone and fax numbers, for publication in the directory so that businesses in the industry could contact it. The advertising program featured plaintiff's contact information so that it would stand out to Blue Book users. According to plaintiff's owner, John Pezl, "the whole point of us being in the Blue Book was to have architects or developers if they needed engineering or professional services to contact us" and so that plaintiff could "contact other engineering firms."

¶ 11       On June 10, 2004, plaintiff entered into a two-year contract to renew its advertising program for the 2005 and 2006 editions of the Blue Book and agreed to pay $3,990. Under the contract, plaintiff had color advertisements in the "Engineers-Consulting" and "Surveyors" categories, a bold listing for the "Architects" and "Cellular Tower Erectors" categories, and a

"super bold" listing in the "A to Z Alphabetical Section." Plaintiff again submitted its contact information, including its fax number, to be published. The June 2004 contract, which was in effect at the time defendant faxed its ad to plaintiff on June 27, 2005, did not include any specific terms or conditions regarding faxed communications from other members of the Blue Book. On June 27, 2005, defendant faxed plaintiff a one-page advertisement listing its crane rental services and the rates that it charged. Defendant's owner, Michael Fitzgerald, obtained plaintiff's fax number from the Blue Book. In an effort to "drum up business and build relationships," Fitzgerald went through the Blue Book and identified businesses that he thought could either use defendant's services or that could refer its services to their customers.

¶ 12    Prior to sending the fax, defendant had never done any direct business with plaintiff, *i.e.*, it had never bought any services from plaintiff or sold any services to plaintiff. However, defendant, like plaintiff, bought an advertising program from the Blue Book and published its contact information, including its fax number, in order to increase its contacts in the commercial construction industry.

¶ 13    On June 20, 2008, plaintiff filed a three-count class action complaint against defendant alleging that it did not give express permission for defendant to send the June 2005 faxed advertisement. Plaintiff claimed that the fax violated the TCPA, constituted conversion and violated the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2008)).

¶ 14    On April 13, 2012, defendant filed a motion for summary judgment as to count I of the complaint, arguing that plaintiff gave its prior express permission to receive faxed advertisements when it published its contact information in the print and online versions of the Blue Book as well as on its website. In support, defendant cited the decision in *Travel 100 Group, Inc. v. Mediterranean Shipping Co. (USA), Inc.*, 383 Ill. App. 3d 149, 150 (2008).

¶ 15    Subsequently, on May 8, 2012, defendant tendered to plaintiff a check in the amount of $903.44, claiming that the tender offer constituted the full amount of damages requested in plaintiff's prayer for relief. On June 4, 2012, plaintiff rejected the tender offer and returned the check to defendant. On June 22, 2012, defendant filed a second motion for summary judgment on grounds of mootness. In that motion, defendant asserted that plaintiff was obligated to accept its tender offer because, although the motion for class certification was filed, it was never spindled for a hearing date and notice was not sent to defendant. Thus, the motion for class certification was not pending at the time the offer was made. The court denied this second motion for summary judgment on August 27, 2012.

¶ 16    On December 12, 2012, the circuit court granted defendant's first motion for summary judgment as to count I, the TCPA claim. In its written opinion and order, the court explained that *Travel 100* held that voluntarily listing your contact information in an industry directory for the purpose of releasing information to businesses in the industry constitutes prior express permission to receive faxes, including advertisements, from industry suppliers. The court found that the facts of *Travel 100* were similar to the instant matter and, therefore, *Travel 100* controlled the outcome in this case. Accordingly, the court decided that plaintiff gave prior express permission to receive faxed advertisements and found that defendant was entitled to judgment as a matter of law. The court also found that plaintiff had an EBR with defendant. Subsequently, defendant moved for summary judgment as to counts II and III of the complaint, and plaintiff filed a motion to reconsider the December 12 order. The trial court ultimately denied plaintiff's motion to reconsider and granted defendant's motion for summary judgment

as to the final two counts, disposing of the case.

¶ 17                                                              ANALYSIS

¶ 18         As an initial matter, we note that in one line at the end of its brief, plaintiff requests that this court reinstate its conversion and Illinois Consumer Fraud and Deceptive Business Practices Act claims. Illinois Supreme Court Rule 341(h) (eff. Feb. 6, 2013) requires parties' briefs to include cohesive argument and citations to relevant authority for each of its claims. The appellate court "is not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate or seek error in the record." *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)). The failure to provide an argument and to cite to facts and authority, in violation of Rule 341, results in the party forfeiting consideration of the issue. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 72. Accordingly, we find that plaintiff has forfeited review of the judgment disposing of its conversion and Illinois Consumer Fraud and Deceptive Business Practices Act claims. We now turn to the court's grant of summary judgment on count I of plaintiff's complaint.

¶ 19         Plaintiff contends that the trial court erred in granting summary judgment on its TCPA claim because it had neither given express consent to receive faxes nor did it have a business relationship with defendant. "Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [Citation.]" *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005).

¶ 20         We review an order granting summary judgment *de novo*. 735 ILCS 5/2-1005(c) (West 2008); *Clark v. Cannon Steel Erection Co.*, 359 Ill. App. 3d 739, 744 (2005). In reviewing a circuit court's ruling on a motion for summary judgment, the appellate court examines the record anew to determine whether a material question of fact exists. *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 396 (2008). Summary judgment allows trial courts to determine whether a genuine issue of material fact exists but is not designed to try a question of fact. *Hernandez v. Alexian Brothers Health System*, 384 Ill. App. 3d 510, 518 (2008). "Although the use of summary judgment aids in the expeditious disposition of a lawsuit, '[s]ummary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt.' " *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001) (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)).

¶ 21         Plaintiff contends that it did not give prior express permission to defendant to send it a faxed advertisement. Specifically, plaintiff asserts that by placing its contact information in the Blue Book it was inviting contact from companies in the industry that wanted to use its services, but was not inviting or giving permission for any other kind of contact. Plaintiff further argues that the plain language of the TCPA and relevant case law indicates that the trial court erred in granting defendant's motion for summary judgment. According to plaintiff, the trial court must have relied on implied consent because plaintiff took no direct action and used no direct words to give defendant permission to send the faxed advertisement. Plaintiff also contends that implied consent to receive faxed advertisements is not sufficient under the law.

¶ 22 Defendant responds that, by voluntarily submitting its contact information to the Blue Book, plaintiff expressly agreed to be contacted by companies in the commercial construction industry, including to receive their advertisements. Additionally, defendant asserts that according to the Federal Communications Commission's (FCC) explanation of the TCPA, the relevant consideration for express consent in a trade directory is whether the person or company understands that, by providing a fax number, he or she is agreeing to receive faxed advertisements, not whether direct actions or words were used.

¶ 23 The TCPA, in pertinent part, provides:

"(a)(1)(3) The term 'telephone solicitation' means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

(4) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

(b) Restrictions on use of automated telephone equipment

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States–

* * *

(C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine[.]" 47 U.S.C. § 227 (Supp. III 2004).

¶ 24 In interpreting the TCPA as it applies to membership in a trade association, the FCC has explained, "it [is] appropriate to treat the issue of consent regarding unsolicited facsimile advertisements on a case-by-case basis." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14129 (2003). The FCC has further explained that when a number is listed in a trade publication or directory, "[e]xpress permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements." *Id.*

¶ 25 The FCC's explanation leads us to the conclusion that our traditional understanding of the meaning of "express invitation or permission" is more nuanced in the context of industry directories. Black's Law Dictionary defines "express" as "[c]learly and unmistakably communicated; directly stated." Black's Law Dictionary 620 (8th ed. 2004). However, the FCC has explained that the main consideration when determining whether express permission has been given in this context is whether the business "understands" that by supplying its fax number to an industry directory, it is agreeing to receive faxed advertisements. According to Merriam-Webster's Collegiate Dictionary, to "understand" is "to grasp the meaning of" or "to achieve a grasp of the nature, significance, or explanation of something." Merriam-Webster's Collegiate Dictionary 1288-89 (10th ed. 1998). Additionally, Black's Law Dictionary defines "understand" as "[t]o apprehend the meaning of; to know." Black's Law Dictionary 1665 (10th

ed. 2014). Whether a party "understands" that it is agreeing to receive faxed ads requires a different analysis than whether a party "clearly and unmistakeably communicated" or "directly stated" its permission to receive a faxed advertisement. To "understand," all that is required is for the business to grasp the significance of placing its fax number in a trade directory and to know that by publishing that number, other businesses in the directory will contact it by fax.

¶ 26    We examine the particular facts of the case within the parameters established by the FCC's rules and regulations implementing the TCPA. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14129 (2003); *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12408 (1995). Here, plaintiff supplied its fax number to the Blue Book for publication and dissemination to companies in the industry so that they could communicate with plaintiff via fax. Plaintiff asserts that its subjective intention in providing its fax number to the Blue Book was for that number only to be used by companies that wanted to purchase its services, not for companies to advertise their services to plaintiff. Plaintiff emphasizes that it had no use for defendant's services. Although not raised by the parties, we note in passing that plaintiff advertised under the "Cellular Tower Erectors" category in the Blue Book. It is reasonable for one to conclude that a company engaged in erecting towers might have need of crane rental services. Thus, plaintiff's argument regarding its own subjective intentions seems questionable. Defendant responds that the standard for whether there was express permission is objective, not subjective. Defendant urges that what matters is the objective action taken by a business when it affirmatively includes its fax number in the Blue Book. We agree with defendant that an objective standard must necessarily govern this inquiry. To conclude otherwise would be untenable. It is impossible for other "customers" to know what another company's subjective intention was when it decided to advertise in the Blue Book. The proper inquiry is whether Blue Book customers, as a group, expect to receive ads and understand that they are agreeing to receive them. See *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 727 (7th Cir. 2011) (demonstrating that the relevant consideration is whether Blue Book "customers" expect to receive advertisements).

¶ 27    The record demonstrates that the Blue Book is a well-established directory of commercial construction businesses that have been vetted by Contractor's Register. According to the publishers of the Blue Book, its purpose is to "bring buyers and sellers together within the commercial construction industry." The Seventh Circuit has observed that "[t]he *Blue Book* brings together companies in construction, civil engineering, and architecture to facilitate their marketing to one another." *Id.* at 626. Moreover, the record here reflects that it is generally understood by members of the community that, by publishing their contact information in the Blue Book, businesses in the industry will contact them. In fact, plaintiff itself published its contact information in the Blue Book to improve its commercial contacts in the industry and so that Blue Book users could contact it. Plaintiff's owner, Pezl, testified that "the whole point of us being in the Blue Book was to have architects or developers if they needed engineering or professional services to contact us."

¶ 28    Plaintiff points out that the FCC has explained that "mere distribution or publication of a telephone facsimile number is not the equivalent of prior express permission to receive faxed advertisements." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. at 14129. We agree that, generally, publishing contact information in an industry directory does not negate the requirement that a company must first obtain prior

express permission before sending a faxed advertisement. However, we conclude that publishing contact information in the Blue Book as a "customer" is more than merely making a fax number public. The process involved in becoming a Blue Book "customer" demonstrates prior express permission to receive faxed advertisements from other Blue Book "customers." The Blue Book is a specialized regional directory with the goal of connecting businesses in the commercial construction industry. As explained above, before businesses are allowed to list their information in the Blue Book, they must be "qualified." To be "qualified," businesses have to submit information to Contractor's Register to prove that they are actually engaged in commercial construction. They must then choose to be included in the Blue Book. Inclusion is voluntary and businesses decide what information they wish to have published. They are not required to publish their fax number.

¶ 29    In other words, Blue Book customers understand that the Blue Book consists of a community of similar businesses that want to increase their contacts and market their services in the commercial construction industry. Significantly, the process of becoming a Blue Book customer ensures that they understand the specialized nature of the Blue Book and requires that they take a number of affirmative actions before their information can be published.

¶ 30    We note that not only did plaintiff elect to be included in the Blue Book, but it also entered into a contract purchasing an extensive advertising program. Pezl expressly authorized plaintiff's information to be publicized when he signed the contract with the Blue Book and submitted plaintiff's contact information, including its fax number, to be prominently featured in a number of categories.

¶ 31    Thus, plaintiff took significantly greater steps to ensure that its contact information would be available to Blue Book customers than ordinary free-listed users. By choosing to submit its contact information, highlighting it in an advertising program, and voluntarily providing its fax number, plaintiff not only understood that Blue Book customers would use that information to contact it, but affirmatively invited contact from Blue Book customers, including by fax. Accordingly, plaintiff gave its prior express permission, as that phrase is understood under the TCPA, to receive faxed advertisements from Blue Book customers.

¶ 32    We note additionally plaintiff's reliance on *CE Design Ltd. v. C&T Pizza, Inc.*, 2015 IL App (1st) 131465, a recent appellate court decision, to support its contention that it did not give prior express permission. In *C&T Pizza*, the court rejected the argument that listing contact information in the Blue Book for construction firms amounted to prior express permission. *Id.* ¶ 25. In so doing, the court noted the FCC's stance on mere distribution or publication of telephone facsimile numbers. We are not completely at odds with the court's finding in *C&T Pizza*. Of significance, the defendant in that case is not in the commercial construction industry, but is instead, in the restaurant business; additionally, unlike in this case, the defendant is not a Blue Book "customer" and did not obtain the plaintiff's fax number from the Blue Book, factors that we deem relevant to disposition of the issue presented here. However, to the extent that the court in *C&T Pizza* characterizes plaintiff's listing in the Blue Book as a "mere distribution or publication," we respectfully disagree. In so doing, we express no opinion on the propriety the defendant's conduct in *C&T Pizza*. We limit our holding to the facts of this case.

¶ 33    Further, we are unpersuaded by plaintiff's argument that relevant case law suggests otherwise. Specifically, we find plaintiff's reliance on *Thrasher-Lyon v. CCS Commercial, LLC*, No. 11 C 04473, 2012 WL 3835089 (N.D. Ill. Sept. 4, 2012), an unpublished decision,

misplaced. Although *Thrasher-Lyon* held that implied consent is not sufficient under the TCPA, the facts of that case are wholly distinguishable from the instant appeal.

¶ 34    In *Thrasher-Lyon*, after a collision between the defendant's vehicle and the plaintiff's bicycle, the plaintiff gave her phone number to the defendant and a police officer. *Id.* at *1. The defendant's insurance company subrogated the claim to a collection agency, which then began to "robo-call" the plaintiff. *Id.* In finding for the plaintiff, the court decided that giving her phone number to resolve the liability issues arising from the collision was not express permission to receive "robo-calls" from a collection agency. *Id.* at *4. Unlike *Thrasher-Lyon*, this case involves a commercial enterprise deliberately publishing a fax number in a trade directory, and not a private individual providing her phone number to a policeman and another private individual for a limited and specific purpose. As discussed above, the FCC's guidance on the meaning of "express permission" when a business publishes a number in a trade directory is whether it "understands" that, by publishing its number, it will be contacted. The holding in *Thrasher-Lyon* has no bearing in our application of the FCC's standard here.

¶ 35    Plaintiff next argues that the trial court erred in relying on *Travel 100* because it is factually distinguishable from the instant appeal. Specifically, plaintiff asserts that, unlike the plaintiff in *Travel 100*, it was never informed that its contact information could be used by defendant to market its services. Plaintiff points out that in *Travel 100*, the plaintiff received letters advising that industry suppliers would use its contact information to market their materials. See *Travel 100*, 383 Ill. App. 3d at 152-54.

¶ 36    In *Travel 100*, the plaintiff, a travel agency, brought an action against the defendant, a cruise company, alleging that it received 93 unsolicited faxed advertisements from the defendant in violation of the TCPA. *Id.* at 150-51. Defendant argued that it had prior express permission to send the faxed advertisements to plaintiff because plaintiff had been a member of the International Airlines Travel Agent Network (IATAN) and routinely provided its contact information to IATAN so that industry suppliers could contact it. *Id.* at 150.

¶ 37    On several different occasions, the plaintiff supplied IATAN with its updated contact information. *Id.* at 155. On each occasion, a representative of the plaintiff signed and returned a form or authorization allowing its contact information to be included in the IATAN database. *Id.* In May 2001, the plaintiff received a letter from IATAN requesting updated contact information and informed the plaintiff that the IATAN " 'code number also enables suppliers to pay commissions and to market their products and services to you directly.' " (Emphasis omitted.) *Id.* at 154. In December 2002, the plaintiff completed and returned a questionnaire with a cover letter that stated, " '[h]aving current information enhances the quality of all of our research/trend data on the travel agency market, and assures that suppliers will direct relevant promotions and FAM [familiarization] trip information to our participants.' " *Id.* at 152. In April 2003, the plaintiff received a letter from IATAN explaining that its "contact information was for inclusion into the IATAN database and that the database's purpose was to 'aid in the administration of IATAN programs to provide contact information to other industry participants.' " *Id.* at 155.

¶ 38    In rejecting the plaintiff's argument, the court explained, "the communications between Travel 100 and IATAN reveal[] that Travel 100 approved the inclusion of its contact information in the IATAN database, and Travel 100 representatives signed and returned documents that expressly stated the information would be provided to travel-industry suppliers, thus inviting communications from those businesses." *Id.* at 154. The court affirmed

the lower court's grant of summary judgment and found the fact that plaintiff authorized IATAN " 'to release the information contained herein to any industry supplier that may wish to use the applicant's services' " to indicate that the plaintiff gave its prior express permission to receive faxed advertisements. *Id.* at 158. The court further explained that "[t]he wheels of commerce would be bogged down" if a company with access to a database had to first reach out to each business in the database to obtain written express permission before it could send it a faxed advertisement. *Id.* at 159.

¶ 39 Although, as plaintiff points out, the *Travel 100* plaintiff received letters that directly advised its contact information would be used for marketing by other companies, the court's conclusion that the plaintiff gave prior express permission was not substantially based on these letters. Rather, the court's analysis hinged on the facts that plaintiff affirmatively sought to be included in the IATAN database so it could improve its commercial contacts, voluntarily provided its contact information to the database, including its fax number, and authorized IATAN to release its contact information to industry suppliers who wished to use its services. *Id.* at 160.

¶ 40 Plaintiff further attempts to distinguish this case from *Travel 100* by focusing on the fact that the *Travel 100* plaintiff provided IATAN with its updated contact information on several occasions. However, the number of times that the *Travel 100* plaintiff submitted its contact information is irrelevant to the court's conclusion that, by providing its contact information to IATAN for release to businesses in the industry, it gave its prior express consent to receive faxed ads.

¶ 41 Defendant maintains, and we agree, that the trial court's reliance on *Travel 100* was proper and that plaintiff has failed to sufficiently differentiate this case from *Travel 100*. Here, as in *Travel 100*, plaintiff voluntarily elected to be listed in the Blue Book and it affirmatively provided its contact information–including its fax number–so that it could improve its contacts in commercial construction. Moreover, Pezl provided signed contracts that expressly authorized plaintiff's information to be published. In *Travel 100*, IATAN maintained a specialized industry database that was designed to connect businesses in the travel industry. Likewise, the Blue Book is a specialized directory that is designed to connect buyers and sellers in the commercial construction industry. Notably, here, plaintiff included its contact information in the Blue Book so that its information would be publicized to businesses in the industry that wished to use its services–the same reason for the conclusion in *Travel 100* that the plaintiff had given its prior express consent to receive faxed ads. Additionally, considering that the purpose of the Blue Book is to connect businesses in commercial construction so that they can market to one another, we believe that it is impractical for a Blue Book customer to first contact each business in the Blue Book and obtain written permission before it can send a faxed advertisement. Accordingly, we find that the trial court did not err when it relied on *Travel 100* in finding that plaintiff had given prior express permission.

¶ 42 Although we find that plaintiff gave its prior express permission to receive the faxed ad, we note briefly defendant's argument that plaintiff's prior express permission to receive the faxed ad is demonstrated by subsequent contracts between plaintiff and the Blue Book which contained language stating that plaintiff agreed to receive faxes from other Blue Book customers. Defendant argues that plaintiff's subsequent permission acts as a ratification of this covenant and incorporates it into the 2004 contract, which did not contain this language. We

reject defendant's argument and decline to consider language in a later signed contract.

¶ 43                           Established Business Relationship

¶ 44      Even if we were to find in favor of plaintiff on the issue of consent, we would nonetheless find that there was an EBR between the parties and thus no violation of the TCPA.

¶ 45      We first address plaintiff's claim that an EBR is an affirmative defense that the court could not raise *sua sponte*. Under the TCPA, it is prohibited "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C) (Supp. III 2004). The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4) (Supp. III 2004). Thus, a required element of a valid TCPA claim is that the fax at issue is sent without prior express permission, *i.e.*, consent. The FCC has "ma[de] clear that the existence of an established business relationship establishes consent to receive telephone facsimile advertisement transmissions." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12408 (1995). Accordingly, it was proper for the court to evaluate whether there was an EBR in order for it to determine whether the fax in question was sent without prior express invitation or permission, a necessary element of the offense.

¶ 46      Moreover, an affirmative defense "is one in which the defendant gives color to his opponent's claim but asserts new matter which defeats an apparent right in the plaintiff. [Citations.]" (Internal quotation marks omitted.) *CitiMortgage, Inc. v. Bukowski*, 2015 IL App (1st) 140780, ¶ 16. An EBR defense does not "give color" to plaintiff's claim. The existence of an EBR negates a necessary element–lack of consent–in a plaintiff's TCPA claim. Additionally, unlike an affirmative defense, an EBR is not a justification to send an unsolicited advertisement. Rather, if there is an EBR, then there can be no unsolicited advertisement, as defined by the TCPA. Therefore, the court properly considered whether there was an EBR between the parties regardless of whether that defense was raised by the defendant.

¶ 47      Next, plaintiff contends that the trial court erred in finding that it had an EBR with defendant because that ruling is contrary to the plain language of the TCPA. Specifically, plaintiff argues that it did not have an EBR with defendant because they never had a relationship of any kind. According to the Code of Federal Regulations (C.F.R.), under telecommunications, "[t]he term *established business relationship* means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber." 47 C.F.R. § 64.1200(f)(3) (2004). The FCC has further explained that the prohibition on unsolicited faxed advertisements includes businesses and is not limited to residential subscribers. *FCC Reminds Consumers About "Junk Fax" Prohibition*, 16 FCC Rcd. 4524 (2001). See also *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 451 (7th Cir. 2010) (*Prism*). Here, it is undisputed that plaintiff and defendant have never bought or sold services from each other or had any two-way communication before the faxed advertisement. However, the C.F.R. further instructs that although an entity's EBR with one business usually does not extend to other businesses, it can extend to an affiliated business when "the subscriber would reasonably expect [the affiliated business] to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate." 47 C.F.R. § 64.1200(f)(3)(ii) (2004).

¶ 48 Clearly, plaintiff had an EBR with the Blue Book because by 2005 there had been several two-way communications between these two businesses. As discussed above, given the nature of the Blue Book as a commercial construction directory that "brings buyers and sellers together," it was understood that plaintiff would be contacted by other Blue Book customers. Thus, plaintiff could reasonably expect that its established business relationship with the Blue Book would extend to Blue Book customers because the purpose of the Blue Book is to increase contact and exposure to other businesses in commercial construction. Therefore, we conclude that the court did not err when it found that plaintiff had an EBR with other Blue Book customers.

¶ 49 Finally, plaintiff asserts that the court erred in relying on *Prism* as it does not indicate that plaintiff had an EBR with defendant. We agree that *Prism* is factually inapposite to the instant appeal. However, like the trial court, we find instructive the *Prism* court's guidance that, generally, an EBR should be construed broadly. In *Prism*, CE Design, the same plaintiff as in this case, brought suit against the defendant, a media company that published trade magazines, under the TCPA for an alleged unsolicited faxed advertisement. *Prism*, 606 F.3d at 445-46. Although plaintiff had never bought any services from the defendant or sold any services to the defendant, the court found that the parties had an EBR because plaintiff subscribed to three of the defendant's publications. *Id.* at 451.

¶ 50 Here, the trial court considered the broad definition of an EBR under *Prism* and the "overall mission of the Blue Book"–to bring buyers and sellers in the commercial construction industry together–and found that plaintiff had an EBR with the community of the Blue Book. The trial court explained that there was an EBR between plaintiff and defendant because plaintiff "actively purchased ads" in the Blue Book, "sought business opportunities form other construction and engineering companies," and "voluntarily provid[ed] its fax number." We agree with the trial court's determination and affirm its ruling that plaintiff had an EBR with defendant.

¶ 51 Defendant's Cross-Appeal

¶ 52 In its cross-appeal, defendant argues that the trial court erred in denying its motion for summary judgment on the grounds of mootness. We note that procedurally, defendant's cross-appeal was improper. "Our supreme court has held that '[a] party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for in the trial court cannot appeal from the judgment.' " *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 25 (quoting *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983)). In the instant appeal, the trial court granted summary judgment in defendant's favor as to all three counts of the complaint, giving defendant all the relief it requested. Therefore, we dismiss defendant's cross-appeal.

¶ 53 CONCLUSION

¶ 54 For the reasons set forth above, we affirm the judgment of the circuit court and dismiss the cross-appeal.

¶ 55 Affirmed.