In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 19-1452

PHYSICIANS HEALTHSOURCE, INC., indi-
vidually and as the representative of a
class of similarly-situated persons,

*Plaintiff-Appellee,*

*v.*

A-S MEDICATION SOLUTIONS, LLC, *et al.*,

*Defendants-Appellants.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cv-05105 — **Matthew F. Kennelly**, *Judge.*

———————

ARGUED JANUARY 16, 2020 — DECIDED FEBRUARY 24, 2020

———————

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

FLAUM, *Circuit Judge.* In February 2010, A-S Medication So-
lutions, LLC ("AMS") sent a fax advertisement to 11,422 dif-
ferent numbers from a recently acquired customer list. Nearly
two years later, Physicians Healthsource, Inc. ("PHI") filed a
putative class action suit asserting that those faxes violated
the Telephone Consumer Protection Act of 1991 ("TCPA"),

47 U.S.C. § 227. The district court subsequently: certified the proposed class; granted PHI's motion for summary judgment on liability against AMS and its CEO, Walter Hoff; entered a nearly $6 million judgement; and approved a distribution plan for that judgment. On appeal, AMS challenges all those decisions but the certification of the class. We affirm.

## I. Background

In March 2009, AMS[1] purchased part of Allscripts, Inc.'s business. As part of that sale, AMS received access to a customer database containing the fax numbers of Allscripts' relevant customers. The database had a customer interface that allowed customers like PHI to manage their own accounts. For example, customers could add or delete their fax numbers as well as check a box informing Allscripts (or subsequently AMS) that they did not want to receive faxes.

Sometime after the transaction, Lauren McElroy, AMS' Vice President of Marketing, drafted a fax to send to Allscripts' former customers at Hoff's direction. On February 10, 2010, Hoff approved the fax and AMS started sending it. Using an automated system, AMS sent the fax to 15,666 fax numbers over the course of 18 days from February 10 to February 28. AMS successfully delivered the fax to 11,422 numbers, including PHI's on February 18. The fax advertised a new service from AMS, provided AMS' contact information, and referenced "The A-S Medication Solution Quality Service Guarantee." AMS never sought or obtained permission from any of the recipients prior to sending the fax. Indeed, Hoff later testified that he believed "[AMS] didn't need to." The fax also

---

[1] We collectively refer to both the individual defendant, Walter Hoff, and the entity defendant, AMS, as "AMS."

lacked a disclaimer explaining recipients' ability to "opt out" of future faxes and how to do so.

PHI subsequently filed a putative class action in Illinois state court against AMS, Hoff, and 10 other John Does under the TCPA, which AMS then removed to federal court. After adjudicating two separate motions to dismiss, the district court certified the case as a class action in September 2016. The certified class included:

> All persons or entities who were successfully sent the Fax providing "A-S Medication Solutions, LLC, Quality Service Guaranteed," and "Ask about our new Pedigree RxSolution!," between February 10, 2010 and February 28, 2010.

Class counsel sent out the notice via fax, rather than physical mail, and directed it at fax numbers as opposed to individuals or entities.

PHI filed its first motion for summary judgment in January 2017. In response, AMS submitted an expert report showing that multiple individuals or entities could have claims for each fax because the fax numbers were registered to multiple individuals in a federal database. Considering this new information, AMS argued the court could not enter summary judgment. The district court denied PHI's motion to strike the expert report but allowed PHI to conduct discovery as to the report. It also denied PHI's motion for summary judgment without prejudice.

PHI's second motion for summary judgment—this time on liability alone—proved successful. The district court found that AMS and Hoff were jointly and severally liable for the

11,418 faxes.[2] AMS subsequently requested the court set a briefing schedule and hold an evidentiary hearing on damages. The court denied that motion, however, concluding that because PHI sought only statutory damages under the TCPA, no evidentiary hearing on damages was necessary. PHI filed a motion for the entry of judgment shortly thereafter, which the district court granted. The court entered judgment for PHI and the plaintiff class in the amount of $5,709,000 (the undisputed number of faxes, 11,418, multiplied by the statutory fine, $500). The court also ordered briefing on how that sum should be distributed to class members.

AMS subsequently filed a motion to alter or amend the judgment or, in the alternative, to reconsider. The district court denied that motion and entered a distribution plan subject to revision regarding the amount of attorney's fees and incentive awards. This appeal followed.

## II. Discussion

AMS specifically challenges (1) the district court's ruling on liability, (2) the denial of its motion for leave to file a surreply to PHI's motion for the entry of judgment, (3) the entry of judgment for PHI, (4) the denial of AMS' motion to alter or amend the judgment, and (5) the adoption of the fund award process.

### A. Liability

We review a district court's grant of a motion for summary judgment de novo, interpreting the facts and drawing all reasonable inferences in favor of the nonmoving party. *O'Brien*

---

[2] Four of the 11,422 fax recipients opted out of the class after receiving notification of the suit.

*v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). Our de novo review necessarily includes a review of the legal framework adopted by the district court. *Martinez v. Cahue*, 826 F.3d 983, 989 (7th Cir. 2016). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citing Fed. R. Civ. P. 56(a)). And summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We may affirm the entry of summary judgment on any ground supported in the record, so long as the parties adequately presented the issue to the district court and the non-moving party had an opportunity to contest it. *O'Brien*, 900 F.3d at 928 (citation omitted).

### 1. *Prior Express Permission or Invitation*

AMS concedes that the fax in question was an advertisement that lacked any kind of disclaimer explaining how to opt out of future faxes. Thus, it cannot rely on the TCPA's established business relationship safe harbor (the so-called "EBR"), which requires—among other things—that the fax contain a notice informing the recipient of his or her ability to avoid future faxes and how to do so. *See* 47 U.S.C. § 227(b)(1)(C)(iii), (b)(2)(D); *see also* 47 C.F.R. § 64.1200(a)(4)(iii). Consequently, AMS may avoid liability for the faxes only if it had prior express permission or invitation to send the fax in question from each of the recipients. *See* 47 U.S.C. § 227(b)(1)(C) (making it unlawful to send an "unsolicited advertisement"); *see also id.* § 227(a)(5) ("The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any

person without that person's prior express invitation or permission, in writing or otherwise.").

We now turn to whether PHI or AMS bore the burden proof on this issue. Although we have never explicitly addressed the question, at least one other circuit has held that defendants bear the burden of proving they had prior express invitation or permission to send the faxes in question to avoid TCPA liability. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2743 (2019) (holding that "'prior express invitation or permission' is an affirmative defense on which [defendants] bear[ ] the burden of proof"). Because we find the reasoning of *True Health* that prior express permission is not an element of a TCPA offense persuasive, we likewise adopt that rule and conclude that AMS had the burden of proof. We must now determine how AMS may meet its burden.

There is scant Circuit precedent regarding what a defendant must put forward to show that it had "prior express invitation or permission." Indeed, it appears our only substantive discussion of the topic came in the dicta of an opinion considering the propriety of class certification. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725–28 (7th Cir. 2011) (suggesting that a firm that affirmatively publishes its fax number in a trade publication has granted prior express permission to members of that trade association). Similarly, the Illinois courts, for example, appear to have only addressed the issue once as well. *See Travel 100 Grp., Inc. v. Mediterranean Shipping Co. (USA) Inc.*, 889 N.E.2d 781, 788–790 (Ill. App. Ct. 2008) (holding that, because plaintiff travel agency had authorized a trade group to disseminate its fax number after be-

ing explicitly informed that such dissemination would "ena-ble[ ] suppliers to pay commissions and to market their prod-ucts and services to" it directly, it had given prior express per-mission).

In this case, the district court relied on the Federal Com-munications Commission's (FCC) definition of "express per-mission." *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14129 (2003). We are similarly bound to follow the FCC's interpretation of a term where, as here, there is no appeal of the FCC's inter-pretation. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 802 (7th Cir. 2017) (citing *CE Design, Ltd. v. Prism Bus. Media*, Inc., 606 F.3d 443, 448–50 (7th Cir. 2010)).

In its 2003 Order, the FCC explained that "[e]xpress per-mission to receive a faxed ad requires that the consumer un-derstand that by providing a fax number, he or she is agreeing to receive fax advertisements." 18 FCC Rcd. at 14129. Per the FCC, such permission may be written or oral. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005*, 21 F.C.C. Rcd. 3787, 3811 (2006). That said, the FCC has explicitly found that "negative options," in which a sender presumes consent unless advised otherwise, are insufficient to prove express permission. *Id.* at 3811 n.168 (explaining that "[a] facsimile advertisement con-taining a telephone number and an instruction to call if the recipient no longer wishes to receive such faxes, would con-stitute a 'negative option'"); *see also* 18 FCC Rcd. at 14130 ("'negative option[s]' [are] contrary to the statutory require-ment for prior express permission or invitation").

In light of the FCC's rules, neither the evidence regarding Allscripts' general practice of getting permission before sending faxes in the course of its business (as testified to by Brian Moffett, an Allscripts executive), nor the fact that Allscripts customers could check a box within its customer database to opt out of receiving faxes, may support a finding of express permission. Moffett's testimony provides no insight as to whether any customer ever consented to receive *fax advertisements*. And, as just explained, advertisers cannot rely on a recipient's failure to "opt out" of receiving faxes to prove that it had prior express permission to send a fax advertisement. Thus, as it did before the district court, AMS must rely upon the affidavits of customers asserting they gave Allscripts prior express permission to fax them ads.

These affidavits fall into three general categories. The first category includes statements suggesting that the individual or entity generally gave permission to receive faxes from Allscripts. As just explained, however, evidence of permission to generally send faxes does not establish prior express permission to fax ads. Similarly, the second category includes post hoc statements that an individual *would have* given consent. These also fail because they do not show AMS had *prior* express permission to send the faxes in question.

The third and closest category includes statements that the affiants and their employers consented to receive "Allscripts' product information" at the beginning of their business relationship with Allscripts. For example, an employee of one of Allscripts' customers provided an affidavit attesting that after her employer bought some medication and software from Allscripts, she wanted information regarding them and thus consented to receive this information via fax. Similarly, AMS

submitted several identical affidavits from other Allscripts customers stating that:

> I do not specifically remember receiving any particular faxes from Allscripts (or a predecessor) promoting its (or others') products or services, but in general, I have consented to receiving such communications from Allscripts and others, in the past and currently as well.

The district court found these uniformly "too thin to permit a reasonable jury to conclude that "consented," as used in the declarations, meets the legal definition of 'prior express permission.'" Specifically, the court explained that the affidavits and other testimony (1) did not permit an inference that the recipient understood he or she was expressly giving, *in advance*, permission to send faxed advertisements, and (2) did not describe the content of the faxes that the declarant purportedly consented to receive. We agree.

First, at a general level, we must ask whether a consumer must renew its permission for every fax advertisement, or whether a consumer's consent at one point in time gives ongoing consent. Both *CE Design* and *Travel 100 Grp.*, as well as the FCC's regulations, imply that a party may consent on an ongoing basis to faxed advertisements. *See* 637 F.3d at 726; 889 N.E.2d at 789; 18 F.C.C. Rcd. at 14128–29. Given the impracticality of any other rule, we make our ruling explicit: Provided a customer gives consent in the manner described below, we will presume that the customer has given permission on an ongoing basis to fax advertisements.

The second and more challenging question is how that permission should be phrased. In light of the FCC's explanation that, for prior express permission to be valid, "a consumer [must] understand that by providing a fax number, he or she is agreeing to receive fax advertisements," 18 F.C.C. Rcd. at 14129, we conclude that the consumer must affirmatively and explicitly give the advertiser permission to send it fax advertisements on an ongoing basis. The invitation or permission cannot simply authorize a single, specific fax, or state that the consumer consented to receive faxed ads from the defendant in the past. Instead, it must explicitly convey that the consumer gives the advertiser ongoing permission to send ads via fax until such time as the consumer withdraws its consent. This framework is both consistent with the FCC's statements on the matter and conforms to the TCPA's text. *See, e.g.*, 18 F.C.C. Rcd. 14129 ("For example, a company that requests a fax number on an application form could include a clear statement indicating that, by providing such fax number, the individual or business agrees to receive facsimile advertisements from that company. Such statement, if accompanied by the recipient's signature, will constitute the necessary prior express permission to send facsimile advertisements to that individual or business.").

With that rule in mind, the third category of affidavits does not demonstrate that the affiants gave prior express permission for faxed advertisements. A statement explaining that a consumer agreed to receive "product information" via fax after purchasing some products or services from a company is not the same as agreeing to accept faxed advertisements. As the FCC and now we have explained, a recipient must specifically acknowledge that faxed advertisements will follow its consent to constitute prior express permission. A

consumer's statement that it gave permission to send "product information" via fax, even on an ongoing basis, after purchasing products or services from a company cannot as a matter of law constitute prior express permission. (It would be a different matter if the affidavits explicitly suggested that that consent included promotional materials or product information regarding products or services not yet purchased.) Similarly, that one had consented to receive a fax advertisement in the past and would have consented to fax advertisements if asked again does not establish ongoing permission to send fax advertisements.

Thus, AMS has not shown that Allscripts had prior express permission to send faxes. Even assuming we concluded otherwise, prior express permission or invitation is not transferrable under the TCPA.

### 2. *Transferability*

The TCPA does not expressly address whether, and to what extent, an entity may transfer or extend an individual's prior express permission to another entity. Because the Act is silent on the issue, PHI points to our statement in *Adeyeye v. Heartland Sweeteners, LLC*, that "Title VII is a remedial statute that we construe liberally in favor of employee protection" and asserts that we should similarly interpret the TCPA in favor of consumer protection. 721 F.3d 444, 450 (7th Cir. 2013). At least two other circuits have done just that. *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013) ("The TCPA is a remedial statute that was passed to protect consumers from unwanted automated telephone calls. … As a result, we should interpret in [plaintiff]'s favor any silence in the TCPA as to a revocation right.") (citations omitted); *see also Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847

F.3d 92, 96 (2d Cir. 2017) (explaining that "[r]equiring plaintiffs to plead specific facts alleging that specific products or services would be, or were, promoted at the free seminar would impede the purposes of the TCPA") (citations omitted). And now we follow suit: The TCPA is a remedial statute that we must liberally construe in favor of consumer protection. Applying that rule here proves decisive.

As is well-established, the TCPA prohibits advertisers from sending advertisements via fax unless they have (1) an established business relationship with the recipient and follow certain requirements, or (2) the recipient's prior express permission or invitation. *See* 47 U.S.C § 227(a)(5), (b)(1)(C), (b)(2)(d). Given those requirements, it would seem odd if a company could solicit express prior permission to send fax advertisements, then transfer that permission to a completely different company who in turn may send advertisements with impunity until the consumer affirmatively terminates its previous permission. Indeed, such a practice could eviscerate the entire statutory scheme which is designed to protect consumers from receiving unwanted contact from unknown entities or individuals.

We also find unpersuasive AMS' argument that generally prohibiting the transfer of permission would create unworkable barriers when one company acquires the assets of another. The obvious solution for a company in AMS' position—the purchaser of a company who seeks to fax advertisements to its new customers—is to adhere to the EBR's requirements, which AMS did not do here. It is entirely consistent with the statute to conclude that if a company changes hands, the company's new owner would qualify for the EBR if they simply step into the former company's shoes, and as a result, have an

existing business relationship with that company's customers. In that scenario, the purchaser would qualify for the EBR on any fax advertisements, provided those ads contained the requisite "opt out" notice. The problem for AMS is that it is simply ineligible for that defense because it omitted the necessary notice.

What is more, our understanding is allied with the FCC's. As the district court correctly noted, the 2006 FCC Order explains that "*the sender* must obtain the prior express invitation of permission from the consumer" before it sends an ad. 21 F.C.C. Rcd. at 3811 (emphasis added). The only logical understanding of this statement is that a fax's sender must procure prior express permission or invitation. Moreover, the beginning of that sentence—"In the absence of an EBR"—confirms our conclusion that the proper defense for a company in AMS' position is the EBR.

AMS points to *CE Design* and *Travel 100 Group, Inc.*, contending that those decisions demonstrate that we and other courts have found that prior express permission or invitation is in fact transferrable. In both those cases, however, we and the Illinois Appellate Court found that the plaintiffs in question had expressly consented to the ability of a group of individuals to send them faxes, not that permission given to one entity could be extended or transferred. In *CE Design*, the named plaintiff knew that by providing his fax number to a trade book for publication, he was granting all the subscribers of that trade guide permission to fax him. 637 F.3d at 725–26. By doing so, we posited, he may have given prior express permission for all recipients of that trade guide to fax him advertisements. The permission in *Travel 100* was even more express. As the court explained, the form that the plaintiff filled

out stated that, by providing the fax number, the plaintiff was "enabl[ing] suppliers to pay commissions and to market their products and services to" it. 889 N.E.2d at 786 (emphasis omitted); *see also id.* at 789–90.

Accordingly, even if Allscripts had received prior express permission or invitation to send the fax in question—and it did not—AMS could not rely on Allscripts' procurement of that permission. And because AMS admitted it never procured prior express permission or invitation from any of the fax recipients, we must conclude that the district court appropriately held it liable under the TCPA.

## B. Entry of Judgment

We next address PHI's challenge of the district court's refusal to hold an evidentiary hearing on damages and its entry of judgment. As an initial matter, however, we must resolve AMS' assertion that the district court erred when it denied its motion to file a sur-reply to PHI's motion for the entry of judgment.

### 1. *Motion for Sur-reply*

District courts abuse their discretion when they deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment and subsequently enter judgment on the basis of those new arguments or facts. *See Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 858 (7th Cir. 2015) ("the district court deprived Meinders due process by entering judgment against him on law and facts to which he did not have a full and fair opportunity to respond"); *see also Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990) ("Where new evidence is presented in a reply to a

motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond."). That, however, is not what happened here.

When it filed its reply brief in support of its motion for the entry of judgment, PHI did not submit any new evidence relevant to the court's entry of judgment. For the reasons explained in greater detail below, the only evidence relevant to the court's entry of judgment after finding AMS liable was how many faxes AMS sent and to what fax numbers. As the record makes clear, there has never been any dispute as to those facts. To the extent that PHI submitted purportedly new evidence establishing the identity of the individuals and entities associated with the fax numbers, that evidence was not relevant to the entry of judgment. Therefore, the district court did not abuse its discretion by declining to allow AMS to file a sur-reply. After a court finds the defendant(s) liable, the question becomes what more must a TCPA plaintiff class prove before the court may enter a money judgment in its favor.

### 2.  *Evidence Required for the Entry of Judgment*

In appealing both the district court's denial of its motion for an evidentiary hearing and its entry of judgment, AMS maintains that the district court erred by never disposing of the purported dispute about who may recover for each of the 11,418 faxes at issue in this case. We find no error in either denial.

In *Ira Holtzman, C.P.A. v. Turza* (*Holtzman I*), we explained that once liability is established and the class informs the court that it seeks only statutory damages, there need not be

an adjudication as to the specific nature of each class members' damages. 728 F.3d 682, 684–85 (7th Cir. 2013). Indeed, each class member need only show that they received the fax and had some connection to the fax machine to recover. *Id.* Although our discussion in *Holtzman I* implied as much, we now explicitly hold that upon a finding a liability, a court may enter judgment as soon as the plaintiffs establish the amount of faxes and the numbers to which those faxes were sent.[3] And, as we explained in *Holtzman I*, a defendant's successful fax log is sufficient on its face to prove these facts. *Id.*

Here, AMS' fax log was in evidence early on and AMS has never challenged its validity. Indeed, the parties have never disputed how many faxes were sent, or to what numbers. Hence, once the district court held that AMS violated the TCPA when it sent each of those faxes, the plaintiffs had established everything they needed to for the court to enter judgment; there was neither any need for further fact finding, nor any delay in the entry of judgment.

## C. Distribution Plan

Finally, that brings us to AMS' objection to the district court's acceptance of a modified version of PHI's distribution plan. AMS insists that the court abused its discretion by entering a distribution plan that does "not ensure that those who will receive judgment awards are actually entitled to an award of damages pursuant to the TCPA." Accounting for our abuse-of-discretion standard of review, we will only reverse if convinced that "no reasonable person could take the view adopted by the trial court." *Lynch v. City of Milwaukee*,

---

[3] Our holding assumes, of course, that the plaintiffs have elected to receive the statutory damages of $500 per fax.

747 F.2d 423, 426 (7th Cir. 1984). We decide that the district court did not abuse its discretion.

As a general matter, each class member must demonstrate that the member had the necessary association (that it received the fax, owned the fax machine, etc.) with one of the 11,418 fax machines that received an improper fax before collecting his or her share of the judgment. That is part and parcel of each class member's burden of proof. *See Holtzman I*, 728 F.3d at 684 ("each recipient must prove that his fax machine or computer received the fax"); *see also Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014) (rejecting the notion that only a fax machine's owner may recover for an unsolicited fax ad). The question is at what point in the process and how they may do so.

Although the parties appear to agree, as do we, that each class member need not meet that burden until a judgment is finally distributed, they dispute exactly what due process requires. Indeed, PHI disputes that a defendant like ASM, who has already been found to have violated the TCPA, has any right to demand evidence that each class member has standing to recover.

Given we have suggested that unclaimed money can revert to the defendant in TCPA cases, *see Holtzman I*, 728 F.3d at 689–90, AMS arguably has a due process interest in ensuring that any class member coming forward to collect the damages for a particular fax has standing to do so. *Cf. Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670–71 (7th Cir. 2015) (holding that a defendant's due process is implicated when the "calculation of each class member's damages affects the total amount of damages it owes to the class"). For example, in *Mullins*, we explained that a defendant's due process rights

are implicated when the defendant may have individual defenses or challenges to the calculation of a given class member's damages. *Id.* Although AMS may no longer raise any individual defenses as to each class member, unlike the example we gave in *Mullins*, AMS' total liability may still be affected if no person with standing comes forward to collect for a specific fax. Thus, AMS has a due process interest in ensuring that at least one person has standing to recover on each fax.

By contrast, AMS has no due process interest in whether more than one individual can collect the $500 fine for each fax. *See Mullins*, 795 F.3d at 670 (explaining that, where damages do not depend on the specific identity of a class member, there is no implication of a defendant's due process rights). Once at least one person has come forward with standing to collect for any given fax, AMS has no further interest in the $500 associated with that fax. With that standard set, we implement it in this case.

This was the distribution plan entered by the district court:

    1)  Notice of the judgment and a contact information form were to be mailed and faxed to the individuals identified on the class list.[4]

    2)  The notice advised class members of the judgment and gave them an opportunity to

---

[4] Although the district court did not specify that the notice of the judgment itself be sent out via fax and mail, it was included within the notice of the motions for fees and expenses, which the court did specifically order to be sent to the fax numbers and mailing addresses identified on the class list.

reject the money by filling out and returning
a form.

3) Non-response to the class notice was inter-
preted as consent to receive payment, which
will be sent out via check made to the indi-
vidual listed on the class list.

Although AMS demonstrated that at least one individual
included on the initial class list submitted to the district court
at certification was deceased at the time the fax was sent, AMS
has not provided any reason whatsoever to doubt that the in-
dividuals listed in that document generally are eligible to re-
cover under the TCPA. Instead, AMS' argument appears to be
that there may be others who are also entitled to recover the
money, in addition to those named on the class list. But as just
explained, the fact that there may be more than one individual
who could collect for a fax is legally inconsequential as to
AMS. So long as the distribution plan entered by the court en-
sures that at least one person has standing to recover for each
fax, we must affirm. *Cf. Holtzman v. Turza*, 701 F. App'x 506,
507 (7th Cir. 2017) (*Holtzman III)* (clarifying that class mem-
bers need not verify that they used a particular fax number
considering that "[w]hose fax numbers those were was estab-
lished from electronic records and does not depend on per-
sonal recollection").

Here, the district court ordered that class counsel send the
notice both by mail to members' physical addresses and via
fax to the numbers with which they are associated. Signifi-
cantly, the notice requires class members to verify that their
information (including name and address) is accurate, and if
not, correct the information and authenticate that they were
affiliated with the fax number at the time they received the

fax. This distribution plan is adequate to guarantee that each class member has standing to collect the funds at issue.

Although the identity and information of some class members may be incorrect, the fact that counsel is faxing the notice to the same numbers that received the offending fax assures us that the individuals responding to it, and subsequently collecting the judgment, do in fact have standing. Thus, we conclude that the distribution plan as it stands now reliably validates that the individuals who will receive the money are entitled to do so. For that reason, the district court appropriately exercised its discretion.

### III. Conclusion

For the foregoing reasons, we AFFIRM.