In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
Nos. 21-2858 & 21-3393
CRAFTWOOD II, INC., doing business as
BAY HARDWARE, et al.,
 Plaintiffs-Appellants,

 v.

GENERAL POWER SYSTEMS, INC.,
 Defendant-Appellee.
 ____________________

 Appeals from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 1:17-cv-04105 — Robert W. Gettleman, Judge.
 ____________________

 ARGUED SEPTEMBER 9, 2022 — DECIDED MARCH 30, 2023
 ____________________

 Before ROVNER, HAMILTON, and SCUDDER, Circuit Judges.
 ROVNER, Circuit Judge. In 2017, lawyers filed over 4,000
“junk fax” lawsuits under the Telephone Consumer Protec-
tion Act of 1991 (TCPA).1 In this one, which has landed before

 1 See https://webrecon.com/webrecon-stats-for-dec-2017-year-in-re-
view/; Sara Randazzo, There’s Money in Faxes— for Plaintiffs, Wall St. J.,
March 24, 2017.
2 Nos. 21-2858 & 21-3393

us for a second time, two hardware companies sued a hard-
ware store supplier for sending three facsimile advertise-
ments that the hardware stores alleged the supplier sent in
violation of the TCPA, 47 U.S.C.A. § 227. The district court
concluded that the hardware stores consented to receipt of the
faxed advertisements and granted summary judgment to the
defendant supplier. Because we find a dispute of fact as to
consent, we remand to the district court for further proceed-
ings.
 With today’s pestilence of robocalls, scam calls, and texts
pinging our attention away, it may be difficult to remember
that there was a time when unsolicited faxes were the nui-
sance of the day. This is particularly true because at the time
Congress passed the TCPA, unsolicited faxes had a monetary
cost to the recipient in the form of lost ink and expensive fax
paper. But today, with nary a facsimile machine in sight,
many (or perhaps most) faxes go directly to an email address
like other unwanted junk emails. The TCPA, however, still
protects unwilling recipients from unsolicited faxes in the
same way it always has, by granting statutory damages of
$500 for each violation of the Act (and three times that for
willful and knowing violations). See 47 U.S.C. § 227(b)(3).
Some of our cases have criticized “junk-fax litigation” as be-
ing fueled primarily by plaintiffs’ attorneys looking for large
fee awards—awards that often come at the expense of small
businesses. Bridgeview Health Care Ctr., Ltd. v. Clark, 816 F.3d
935, 941 (7th Cir. 2016) (“We doubt that Congress intended
the TCPA, which it crafted as a consumer-protection law, to
Nos. 21-2858 & 21-3393 3

become the means of targeting small businesses.”).2 But as we
noted when this case was before this court the first time,
“[w]hether it is good public policy to use the cumbersome and
costly process of adjudication to resolve disputes about an-
noying fax ads is for Congress to decide.” Craftwood II, Inc. v.
Generac Power Sys., Inc., 920 F.3d 479, 481 (7th Cir. 2019). Con-
gress has not told us otherwise, and so we continue to dili-
gently decide cases as they travel from district court to appel-
late court and back again, as this one illustrates. And regard-
less of whether it is good public policy to use so many court
resources and so handsomely reward litigiousness over an-
noyances that have been greatly diminished by changes in
technology, the plaintiffs are entitled to use the law to enforce
their right not to receive unsolicited faxes. And we are obli-
gated to follow the law as Congress has written it.
 I.
 This case involves a total of three facsimile advertisements
sent to two hardware stores in Southern California owned
and operated as a family business by David and Cynthia
Brunjes. They established one store, Craftwood II (also called

 2 For example, Craftwood Lumber Company (an entity that shares an

owner/president in common with the Craftwood entities in this case) re-
ceived $25,000 as an incentive award for acting as a class representative in
a TCPA suit against Interline Brands in which the total settlement award
was $40 million. Counsel for that case (the same firm that represents the
Craftwood Stores in this case) received $9.5 million in fees. See Craftwood
Lumber Co. v. Interline Brands, Inc. et. al., No. 1:11-cv-04462 (N.D. Ill.), R.
152 at 9, 12. As of the date of David Brunjes’ deposition in the case before
us now, various Craftwood entities had been involved in about a dozen
TCPA cases. See R. 253-6 at 57 (D. Brunjes Dep. at 223). A Westlaw search
indicates that the same law firm, Payne and Fears, LLP, has represented
the Craftwood entities in each of these suits.
4 Nos. 21-2858 & 21-3393

Bay Hardware) in 2009, and in 2013, they established Craft-
wood III (also called Lunada Bay Hardware, but we will call
them Craftwood II and III respectively for simplicity, and to-
gether, the “Craftwood Stores”). Craftwood II is operated by
the Brunjes’ daughter, Diana Newton, and another manager.
Newton also oversees Craftwood III along with a different
manager. Although the Craftwood Stores are independent
hardware stores, they are part of the Do It Best (DIB) hard-
ware industry cooperative and wholesaler. By joining the co-
operative, hardware stores receive access to better prices from
vendors, as well as advertising and buying assistance.
 The defendant, Generac Power Systems, is one of many
companies that supplies goods to DIB for purchase by hard-
ware retailers who belong to the DIB cooperative. Those re-
tailers in turn sell Generac’s wares to the public. Generac had
an agreement with Comprehensive Marketing, Inc. (CMI), an
independent sales and marketing representative that assisted
Generac, along with many other DIB vendors, to get their
products from the vendor to the market, including by assist-
ing with promotional materials and other marketing ven-
tures. As part of its role, CMI sent out faxes to DIB-member
hardware stores advertising deals on Generac products, in-
cluding the three at issue in this case—one sent in July 2016 to
Craftwood II, and one in February 2013, sent to both Craft-
wood Stores. All three faxes were addressed to the “Store
Manager/Owner.” R. 1-1, 1-2, 1-3.
 The Craftwood Stores sued Generac and CMI, claiming
that those three faxes were sent in violation of the TCPA,
which forbids any person or entity from using “any telephone
facsimile machine, computer, or other device to send, to a tel-
ephone facsimile machine, an unsolicited advertisement.” 47
Nos. 21-2858 & 21-3393 5

U.S.C. § 227(b)(1)(C). The Craftwood Stores dismissed the suit
against CMI on December 27, 2019, and thus only the actions
against Generac remain. The claims include requests for indi-
vidual and class action relief, including statutory damages of
$500 for each violation, treble damages for any intentional vi-
olation, injunctive relief, and attorneys’ fees and costs.3
 The district court initially dismissed the case finding that
the Craftwood Stores lacked standing to bring their claim
(Craftwood II, Inc. v. Generac Power Sys., Inc., No. 17 C 4105,
2018 WL 11468610, at *2 (N.D. Ill. Aug. 1, 2018)), but we re-
versed and remanded, allowing the case to proceed. Craftwood
II, 920 F.3d at 483.
 On remand, Generac’s defense relied on the TCPA’s ex-
emption for faxes sent where the recipient gave “prior express
invitation or permission, in writing or otherwise.” 47 U.S.C.A.
§ 227(a)(5). As evidence of consent, Generac pointed to the
agreement that the Craftwood Stores’ representative signed
when the companies joined the DIB cooperative, which Gen-
erac claims contained language demonstrating that the Craft-
wood Stores consented to receiving faxes from suppliers. The
first paragraph of that agreement stated:
 The Corporation agrees to sell its goods and
 provide its advertising programs, training
 services and other programs to Member (so
 long as Member makes timely payment
 therefore) at the Corporation’s established

 3 In consideration for various promises by the defendant, the plaintiffs

stipulated to withdraw, without prejudice, their pending protective mo-
tion for class certification. R. 122. Thus there are no class certification is-
sues before us on appeal.
6 Nos. 21-2858 & 21-3393

 prices, terms, and conditions and in accord-
 ance with the Corporation’s established busi-
 ness policies and practices which are in effect
 from time to time, for sale and use by Mem-
 ber … .
R. 253-12 at 1 (R. 259 at 1). In return, the member agrees to
purchase most of its products from DIB. In a later part of the
agreement, there is a place for the applicant to provide contact
information, including a fax number, which the Craftwood
Stores provided.
 One of the optional services that DIB provides to coopera-
tive members is an opportunity to receive advertising materi-
als that a member store can purchase to send to its own cus-
tomers. And so, for example, rather than creating its own mar-
keting material, catalogues, coupons, or flyers, a DIB member
hardware store can sign up to receive these types of promo-
tional materials to send to its customers. Craftwood II and III
both opted into one such program called the Ad-Pak pro-
gram. According to DIB’s online information for cooperative
members, the Ad-Pak program “includes more than 50 pro-
motions designed to help drive traffic, develop customer loy-
alty, and build your local brand. … We’ll help you identify
the best weeks of the year to promote your products, secure
outstanding deals, and customize all marketing components
so you’re telling a relevant, local story to your customers.”
R. 272-2 Ex. B, p.2.
 The district court ultimately granted summary judgment
for Generac, finding that the contract between the Craftwood
Stores and DIB evinced an agreement by the former to receive
faxes, including from vendors. As support for its conclusion,
the district court focused on the explicit language of the
Nos. 21-2858 & 21-3393 7

agreement quoted above, along with the fact that the plaintiffs
provided their fax number as contact information in a later
part of the document, and, to a lesser extent, that the plaintiffs
had opted into the Ad-Pak program. The court found further
support from the testimony of a CMI employee who testified
that she received direct permission to send fax advertise-
ments in a telephone call to Craftwood II. We review the dis-
trict court’s grant of summary judgment de novo, interpreting
the facts and drawing reasonable inferences in the light most
favorable to the Craftwood Stores. Physicians Healthsource, Inc.
v. A-S Medication Sols., LLC, 950 F.3d 959, 964 (7th Cir. 2020).
We will affirm the entry of summary judgment only if there
are no issues of material fact and the movant, Generac, is en-
titled to judgment as a matter of law. Id.
 II.
 A.
 Prior express consent is an affirmative defense on which
Generac bears the burden of proof. Id. Generac claims that it
can demonstrate prior express permission, and thus avoid li-
ability under the TCPA, in two ways. First, it claims that the
written agreement between the Craftwood Stores and the DIB
cooperative gave Generac permission to send the faxes. Sec-
ond, it claims that an employee of CMI received express per-
mission during a phone call with Craftwood II. We will con-
sider each of these in turn.
 Generac argues that the Craftwood Stores gave express
permission to receive faxed advertising by entering into a
membership agreement which mentioned “advertising pro-
grams” and then providing their fax numbers. The district
court agreed, holding that the combination of the term
8 Nos. 21-2858 & 21-3393

“advertising program” and plaintiffs’ provision of their fax
number constituted express permission to receive fax adver-
tisements. D. Ct. Op. (R. 16) at 9. That conclusion, however,
does not accurately reflect the actual language of the agree-
ment.
 Our circuit interprets the TCPA in favor of consumer pro-
tection. A-S Medication Solutions, 950 F.3d at 967. In defining
what constitutes express permission, we have made clear that
“’[e]xpress permission to receive a faxed ad requires that the
consumer understand that by providing a fax number, he or
she is agreeing to receive fax advertisements.’” Id. at 965
(quoting 18 FCC Rcd. at 14129). The permission may be writ-
ten or oral, but it must be affirmative; the sender may not pre-
sume permission unless otherwise advised. Id. Evidence of
permission to send faxes generally does not establish prior ex-
press permission to fax advertisements. Id. at 966. And so, for
example, permission to receive product information by fax
does not grant permission to receive faxed advertisements. Id.
at 967. Moreover, permission to receive a single faxed adver-
tisement does not grant permission to send more faxes on an
ongoing basis, unless the permission affirmatively and explic-
itly gives the advertiser permission to send the faxes on an
ongoing basis. Id. at 966. It would be fair to summarize from
all of this that our case law requires some fairly specific and
reliable indicia of permission.
 With those standards in mind, we turn to the cooperative
agreement that Generac asserts gave it permission to send
faxes to the Craftwood Stores. If we reduce the agreement lan-
guage to its relevant parts—those that reference advertising
—“The Corporation agrees … to provide its advertising pro-
grams to Member (so long as Member makes timely payment
Nos. 21-2858 & 21-3393 9

therefore) … , for sale and use by Member.” R. 253-12 at 1 (R.
259 at 1). On its face, this is language that DIB has agreed to
do something—provide advertising programs—in exchange
for payment from the Craftwood Stores. Stating that “DIB
agrees to provide advertising programs as long as Craftwood
timely pays” would be an odd way to say “Craftwood agrees
to receive fax advertising from DIB.” Moreover the agreement
speaks of “advertising programs … for sale and use by [the
Craftwood Stores].” The implication of this language is that
DIB will provide marketing materials for the member hard-
ware store to distribute to their customers, in exchange for re-
muneration. In other words, the intended audience for the ad-
vertising Craftwood was purchasing was its customers, not
Craftwood itself. But in any event, we need not decide
whether this language gave DIB permission to send fax ad-
vertising. For even if it did give permission to DIB, it certainly
did not give Generac permission to send fax advertising. Gen-
erac was not a party to the agreements and we have con-
cluded that express permission under the TCPA is not trans-
ferable, as it is the sender itself who must procure that per-
mission. See A-S Medication Sols., 950 F.3d at 967 (noting that
it would eviscerate the statutory scheme to allow a company
to solicit express prior permission to send fax advertisements
and then transfer that permission to a completely different
company who in turn may send advertisements with impu-
nity).We find, as a matter of law, that whatever the agreement
may have said about the relationship and permission between
DIB and the Craftwood Stores, there was no language in the
agreement that can be read as indicating that the Craftwood
Stores gave prior express consent to receive fax advertising
from Generac.
10 Nos. 21-2858 & 21-3393

 Although it does not appear to be the primary basis for the
decision, the district court also mentioned the Ad-Pak pro-
gram as further evidence of an agreement to receive advertis-
ing programs. D. Ct. Op. (R. 16) at 7. (“… and plaintiffs opted
into the Ad-Pak program.”). But as the district court con-
ceded, two of the three faxes—the ones date-stamped 2-13-
2017 and sent to both Craftwood Stores—were fax ads tar-
geted exclusively to the hardware stores themselves as op-
posed to their customers, and thus were not the types of ad-
vertisements contemplated by the Ad-Pak program at all. See
D. Ct. Op. (R. 16) at 7, n.3. The other fax (date-stamped 7-28-
2016 and sent only to Craftwood II), included a cover letter
addressed to the hardware store on the first page and an ex-
tended warranty form for customers to fill out on the second
page. R. 1-2, 1-3. Whether this latter fax was part of the Ad-
Pak program to which the Craftwood Stores subscribed is a
question of fact that can be resolved, if necessary, on remand.
The two ads sent to each of the Craftwood Stores on 2-13-2017
could not have been part of the Ad-Pak program that pro-
vided advertising to pass along to customers. They were un-
equivocally advertisements targeted at the hardware stores
themselves.
 In sum, we can rule out the contract language as sufficient
evidence that the Craftwood Stores gave Generac “affirma-
tive[] and explicit[]” prior express permission to fax adver-
tisements to the stores. See A-S Medication, 950 F.3d at 966. Our
conclusion does not conflict with the Eleventh Circuit’s deci-
sion in Gorss Motels, Inc. v. Safemark Sys., LP, 931 F.3d 1094
(11th Cir. 2019). In that case, the Eleventh Circuit found that
hotel franchisees who entered into agreements with Wynd-
ham Hotel Group had given prior express permission to
Wyndham’s affiliates to send fax advertisements when it
Nos. 21-2858 & 21-3393 11

signed a franchise contract “agreeing that Wyndham affiliates
could offer assistance with purchasing items for the hotels
and by providing their fax numbers” Id. at 1100. The agree-
ment in the case before us contains no equivalent express lan-
guage allowing DIB’s affiliates to offer optional assistance in
purchasing items or any other similar agreement to receive
assistance from affiliates. It makes no mention of affiliates at
all. Whatever our circuit might make of the language in the
agreement in Gorss Motels, particularly in light of our clarify-
ing decision in A-S Medication Solutions, we cannot say, but we
can note that the agreement here between DIB and the Craft-
wood Stores contains no language whatsoever allowing affil-
iates to offer purchasing assistance. When and if we encoun-
ter an agreement closer to the one analyzed in Gorss Motels,
we can assess whether our understanding of express prior
consent aligns with that of the Eleventh Circuit.4
 Our conclusion about the contract language, however,
does not end the matter. Generac alleges that it received per-
mission in a second and more direct fashion. According to
Generac, CMI received direct permission to send faxes to
Craftwood II on behalf of Generac when, in 2012, an employee
of CMI, Sherri Davis, called Craftwood II and asked for the
store’s fax number for the purpose of sending promotional
materials “generally and on an ongoing basis.” Generac Brief
at 10. We note from the start that this argument only applies
to Craftwood II, as Generac does not claim that Davis ever

 4 This Circuit recently resolved an appeal of another of Gorss Motels

TCPA suits. Gorss Motels, Inc. v. Brigadoon Fitness, Inc., 29 F.4th 839 (7th
Cir. 2022). That appeal concerned the denial of class action certification
and is not directly relevant to the substance of the dispute before us now.
12 Nos. 21-2858 & 21-3393

called Craftwood III, and indeed she could not have, as Craft-
wood III was not incorporated until 2013.
 According to Generac, in 2012, Davis worked on a project
for which she was to record on a spreadsheet a list of DIB co-
operative members who would be interested in receiving pro-
motional material from DIB vendors, such as Generac. Davis
testified at her deposition that she called each entity on the list
and said, “I was wondering if I could get your fax number in
order to send you some promotions.” R. 253-3 at 28 (Davis
Dep. at 104).5 Specifically, as it pertains to Craftwood II, Davis
stated in her August 14, 2019 declaration that on May 12, 2012,
she placed a phone call to “the Craftwood stores to obtain
their fax number in order to send them promotional sales ma-
terials. During these telephone calls, Craftwood provided to
me in 2012 their fax numbers for the express purpose of CMI
to provide [sic] Craftwood with sale promotions by fax.”
R. 253-16 at 2. In her later deposition, on July 22, 2020, Davis
admitted that she did not recall the specifics of the conversa-
tion with Craftwood II, including to whom she spoke or what
was discussed, but according to her system, if a store agreed

 5 Generac’s brief states that “Davis requested Craftwood II’s ‘fax num-

ber to send [it] promotions’ generally and on an ongoing basis.” Generac
Brief at 10. As support for this proposition, it cites to Davis’ deposition at
R. 253-3 at 28 (Davis Dep. at 102). At oral argument the court asked Gen-
erac to clarify where specifically in the record it found support for the
“generally and on an ongoing basis” language. Generac filed a post-argu-
ment memorandum in which it cited to Davis’ statement that her project
involved “gathering fax numbers in order to send promotions,” and other
references to “promotions” in the plural as evidence that the permission
granted was not limited in time or number. Appellate Court Record at 37.
It will be the job of a factfinder to determine whether this is sufficient evi-
dence of ongoing permission.
Nos. 21-2858 & 21-3393 13

to receive fax promotions, she recorded its fax number in the
final column on her spreadsheet, and, although she did not
recall the specific conversation, by looking at her spreadsheet,
she was able to see that Craftwood II’s fax number was rec-
orded in the final column of the spreadsheet, thus indicating
that it had given permission to receive fax advertisements.
 Generac describes Davis’ testimony that she received per-
mission as “uncontested,” and the district court agreed, but
we find that conclusion to be at odds with the party’s factual
assertions in this case. Craftwood II’s representatives pre-
sented ample evidence from the record supporting its stance
that the call did not and could not have happened, as the store
has a longstanding policy against giving permission to re-
ceive faxes. See R. 272-2 at 2 (Newton Dec. at ¶¶6, 7,9, 11);
R. 253-6 at 62–64 (D. Brunjes Dep. at 244–249); R. 253-7 at 46–
47, 49 (Newton Dep. at 179-182, 192); R. 272-1 at 1–4 (D. Brun-
jes Dec. at ¶¶ 4–7). Craftwood II also points out that Davis’
spreadsheet was labeled “DIB Lutron Fax List with Revi-
sions,” and was created in 2012, and so, at best, it would be
evidence of permission for one particular fax, but not of on-
going permission to send unlimited faxes.
 This is a classic factual dispute: Generac’s witness, Davis,
testified that she made a phone call to and received permis-
sion from Craftwood II to send it fax advertisements. Craft-
wood II, on the other hand, asserts that it never received any
such call and that it has and had a longstanding policy of not
giving approval for fax advertisements. On summary judg-
ment a court cannot “weigh conflicting evidence, resolve
swearing contests, determine credibility, or ponder which
party’s version of the facts is most likely to be true.” Runkel v.
City of Springfield, 51 F.4th 736, 742 (7th Cir. 2022) (quoting
14 Nos. 21-2858 & 21-3393

Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 760 (7th
Cir. 2021)).
 The depositions certainly leave room for a fact finder to
assess the credibility of witnesses and the likelihood both that
the phone call occurred and that Craftwood II’s “no fax” pol-
icy was as clear, known, and disseminated to its employees as
Craftwood II asserts that it was. The testimony by both parties
shifted and curved throughout this litigation, and sometimes
within the course of a single deposition.6 But all of these pre-
sent credibility issues for a jury. None of these assertions are
so implausible on their face that a reasonable jury could not
find in Craftwood II’s favor on this factual dispute. See Kodish
v. Oakbrook Terrace Fire Prot. Dist., 604 F.3d 490, 507 (7th Cir.
2010) (citing Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003)).
 Because the contract language could not have been inter-
preted to mean that the Craftwood Stores granted anyone
permission to send them fax advertisements, and there is a
material factual dispute as to whether Craftwood II gave

 6 For example, David Brunjes at first stated that he did not recall if

Sheri Davis had contacted him in May 2012 to obtain his express permis-
sion to send a faxed promotion. R. 253-6 at 54 (D. Brunjes Dep. p. 212). He
later testified, after a break and consultation with his lawyer, that “I would
have recalled a conversation like that.” R. 253-6 at 63 (D. Brunjes Dep. at
245–46). Diana Newton at first testified that that she did not recall whether
she took a call from Davis nor did she know if anyone else would have
given out the fax number, but then, after a break and consulting with her
attorney, stated with certainty that no one in the store would have given
out the fax number. Compare R. 253-7 at 46 (Newton Dep. at 179–80) with
Id. at 47 (Newton Dep. at 181–82).
Nos. 21-2858 & 21-3393 15

Davis prior express permission to send faxes, we remand for
further proceedings.
 B.
 One final matter remains on the table: the Craftwood
Stores argue that the district court made a mistake of law
when calculating costs by awarding the defendant PACER
and computerized research charges in the amount of
$3,555.30. Although our reversal may alter the assessment of
costs at the end of the day, we note once again that PACER
and computerized research costs are not separately recovera-
ble as costs.
 We made clear in Haroco, Inc. v. Am. Nat'l Bank & Trust Co.,
38 F.3d 1429, 1440 (7th Cir. 1994) that computerized research
costs are not recoverable under 28 U.S.C. § 1920, as they are
not specifically enumerated in the statute, and are instead
considered a form of attorneys’ fees. Id. at 1440. Attorneys’
fees are not separately recoverable expenses. Montgomery v.
Aetna Plywood, Inc., 231 F.3d 399, 409 (7th Cir. 2000). In Haroco,
we explained that computerized research is properly catego-
rized as attorneys’ fees because “the added cost of computer-
ized research is normally matched with a corresponding re-
duction in the amount of time an attorney must spend re-
searching,” and therefore there is “no difference between a
situation where an attorney researches manually and bills
only the time spent and a situation where the attorney does
the research on a computer and bills for both the time and the
computer fee.” Haroco, 38 F.3d at 1440–41. Although we have
not stated it directly, our conclusion that computer research
charges are considered a form of attorneys’ fees and not costs
applies equally to PACER research, which is, of course, just
another form of computerized research. This is certainly how
16 Nos. 21-2858 & 21-3393

the district courts have interpreted our decision in Haroco, and
they are correct. See, e.g., Pezl v. Amore Mio, Inc., No. 08 C 3993,
2015 WL 2375381, at *6 (N.D. Ill. May 13, 2015) (denying costs
for PACER research); Freedom Mortg. Corp. v. Burnham Mortg.,
Inc., No. 03 C 6508, 2008 WL 4534162, at *2 (N.D. Ill. Oct. 3,
2008) (denying costs for PACER research); Angevine v.
WaterSaver Faucet Co., No. 02 C 8114, 2003 WL 23019165, at *9
(N.D. Ill. Dec. 23, 2003) (“charges for Pacer research fall into
the same category as Westlaw and Lexis computerized re-
search charges” and “are not recoverable as costs under §
1920.”).
 Generac cites dicta in one of our decisions suggesting that
computerized research charges are recoverable under § 1920.
Little v. Mitsubishi Motors N. Am., Inc., 514 F.3d 699, 701 (7th
Cir. 2008) (“Mr. Little contends that the award of costs for cop-
ies, computerized research, summonses, subpoenas, delivery
services and a video-recorded deposition are not authorized
by 28 U.S.C. § 1920. We disagree. All of the above costs are
authorized by § 1920.”). However, Little did not discuss the
rationale nor the authority for this proposition. In fact, one
month later, this court reiterated the rule that computerized
legal research expenses are properly categorized as attorneys’
fees. Tchemkou v. Mukasey, 517 F.3d 506, 513 (7th Cir. 2008).
This sentence in Little is non-controlling and does not over-
turn long-standing precedent in Haroco.
 We REVERSE the grant of summary judgment for Generac
and REMAND for proceedings consistent with this opinion.